UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------x
In re:                                       :  Chapter 11 Case
                                             :
                                             :  Case No. 10-11166 (CSS)
WESTLAND DEVCO, LP,                          :
                                             :  Hearing Date: TBD
               Debtor.                       :  Objection Deadline: TBD
---------------------------------------------------------------x

**MOTION OF BARCLAYS CAPITAL REAL ESTATE INC.
TO DISMISS THE DEBTOR'S CHAPTER 11 CASE
PURSUANT TO SECTION 1112(b) OF THE BANKRUPTCY CODE**

Barclays Capital Real Estate Inc. ("Barclays"), in its capacity as Agent and Lender under that certain Amended and Restated Loan Agreement dated July 16, 2008 (as amended, the "Amended Loan Agreement"),[1] hereby moves for the entry of an order: dismissing this chapter 11 case filed by Westland DevCo, LP ("DevCo LP" or the "Debtor") for cause under 11 U.S.C. § 1112(b) (the "Motion"). In support of the Motion, Barclays states as follows:

## I. JURISDICTION

1. The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2. This is a core proceeding within the meaning of 11 U.S.C. § 157(b)(2)(G).

3. The statutory predicates for the relief requested herein are section 1112(b) of the United States Bankruptcy Code (11 U.S.C. §§ 101 et seq.) (the "Bankruptcy Code") and Rules 1017 and 9014 of the Federal Rules of Bankruptcy Procedure.

---

[1] *See* Declaration of Mark Wuest (the "Wuest Declaration"), a copy of which is annexed hereto as Exhibit 1, at Exhibit C thereto (Amended Loan Agreement).

## II. PRELIMINARY STATEMENT

4. This chapter 11 case is a classic example of a single-asset real estate debtor that rushes to file a bankruptcy petition purely as a litigation tactic, to stave off imminent state court foreclosure and loss of control of the property. The transparency of this tactic is shown by its timing: The Debtor's loan originally matured on December 7, 2007, then the Debtor exercised an option to extend it to June 6, 2008, and then Barclays agreed to further extend it three times: first to July 7, 2008 and July 16, 2008 as part of forbearance discussions, and then to July 9, 2009 under the Amended Loan Agreement.[2] The Debtor failed to pay the loan on this final maturity date, prompting Barclays to file its foreclosure suit in New Mexico state court on December 15, 2009,[3] and motions for summary judgment against the Debtor and for the appointment of a receiver on February 19, 2010.[4] The two motions were scheduled for hearing before the New Mexico state court on April 5, 2010, at 2:00 p.m. (Mountain) / 4:00 p.m. (Eastern). The Debtor filed its chapter 11 petition at 1:16 p.m. (Mountain) / 3:16 p.m. (Eastern) on April 5, 2010 – 45 minutes before the New Mexico state court hearing.[5]

5. The Debtor is obviously using the chapter 11 process to thwart the state court litigation, which Barclays filed to enforce its rights and finally bring this failed project to an end. As demonstrated below, the Debtor admits that it has no meaningful income (less than $50,000 per year) and less than $4,000 in available cash, and offers this Court a wildly optimistic

---

[2] Wuest Declaration, ¶¶ 16-17.

[3] *Barclays Capital Real Estate Inc. v. Westland DevCo, LP, et al.*, Case No. CV-2009-14749, Second Judicial District Court, County of Bernalillo, State of New Mexico (the "New Mexico Foreclosure Suit"). A copy of Barclays' complaint in the New Mexico Foreclosure Suit (the "State Court Complaint"), without exhibits (most of which are attached to the Wuest Declaration), is annexed hereto as Exhibit 2.

[4] Copies of Barclays' summary judgment and receiver motions are annexed hereto as Exhibit 3 and Exhibit 4.

[5] A copy of the April 5 hearing notice from the New Mexico Foreclosure Suit is annexed hereto as Exhibit 5. A copy of the page from the Court's website showing the time of the filing of this case is annexed hereto as Exhibit 6.

valuation of its sole real estate asset ($353 million) that is three times the value of Barclays' recent appraisals of the property. The Debtor refuses to be candid with this Court that it is severely "under water" on a project that it has been unable to develop since it acquired the property over three years ago. The Court should not countenance the Debtor's abuse of the bankruptcy process to forestall the inevitable and should promptly dismiss this case.

6. The only property at issue is the Debtor's sole asset: approximately 55,000 acres of largely undeveloped land in Albuquerque, New Mexico (the "Real Property"). *All* of this real property, and all personal property related to this tract, is pledged to Barclays as security for its 2006 loan, which the Debtors admitted in its answer to the New Mexico foreclosure suit.[6] The Debtor has also admitted, in this Court and the New Mexico state court, that it has no other materials assets and *de minimis* cash flow.[7] As the Debtor's Executive Vice President stated in a sworn affidavit filed to oppose Barclays' New Mexico suit:

> The appointment of a receiver also is unnecessary because the income derived from the Project pales in comparison to the total amount of the Loan. Barclays alleges that it is owed more than $188,818,418.71 from DevCo. *In 2009, however, the Project generated less than $50,000 in income*. Therefore, DevCo's 2009 Property-related income constituted less than .01% of the Loan, a sum too insignificant to justify the receiver's anticipated costs and expenses. *The projected income for 2010 will be less than what DevCo received in 2009*. DevCo also owns no goods or other movable personal property for the receiver to seize.[8]

---

[6] Copies of Barclays' mortgage and related amendments with respect to the Real Property and related personal property (collectively, the "Mortgage") are annexed to the Wuest Declaration as Exhibit A and Exhibit E. *See also* the Debtor's Answer to the State Court Complaint, filed on January 29, 2010 (the "State Court Answer"), a copy of which is annexed hereto as Exhibit 7, ¶¶ 9-31 (admitting Barclays' loan and that the Debtor executed the Mortgage and various other security agreements).

[7] *See* Declaration of Bruce V. Cook in Support Debtor's Chapter 11 Petition (the "Cook Declaration"), a copy of which is annexed hereto for convenience as Exhibit 8, ¶ 9 (describing the Debtor's assets as $360.6 million, almost all of which consists of unspecified "land and development costs" ($352,511,243.75), and listing a *de minimis* amount of cash ($3,910.19) and "restricted cash" of $3.8 million which it does not identify or describe). The Debtor fails to account for a balance of $4.246,756.90 in its figure for total assets.

[8] Affidavit of Bruce Cook in Opposition to Application for Appointment of Receiver and in Opposition to Plaintiff's Motion for Partial Summary Judgment, dated March 8, 2010 and filed in the New Mexico

7.     The Debtor's words speak for themselves.  Its own admission that it has no material assets besides the Real Property – all of which is pledged to Barclays – and that even its miniscule cash flow is *declining*, begs the question of what it hopes to accomplish by this chapter 11 filing.  The Court should know that Barclays has spent much of the past *two years* attempting to restructure this loan with the Debtor.  As noted above, the loan originally matured on December 7, 2007 and has been extended several times, finally to July 9, 2009.[9]  When this final maturity date came and went with no payment or meaningful restructuring proposal by the Debtor, Barclays sent a default notice on August 17, 2009.[10]  With no change in the status quo during the fall of 2009, Barclays finally filed its foreclosure suit in New Mexico on December 15, 2009, and its motions for summary judgment and for the appointment of a receiver on February 19, 2010.  A hearing was set for the afternoon of April 5, 2010, which the Debtor stayed through this chapter 11 filing.

8.     In the meantime, Barclays has steadily watched its claim against the Debtor increase – as of the chapter 11 petition date, it stood at $194,258,208.66[11] – and its collateral decline in value.  The Debtor's original plan was to use the Barclays loan only as a bridge loan: the Debtor used the proceeds to acquire the Real Property in 2006, and the loan had a limited maturity of one year with a six-month option to extend, after which it was expected to refinance

---

foreclosure suit on March 9, 2010 (the "Cook State Court Affidavit"), a copy of which is annexed hereto as Exhibit 9, ¶ 14 (emphasis supplied).  *See also Id.* at ¶ 5 ("the Property generates no significant rent or other income to protect or to pay for a receivership"); State Court Answer, ¶ 64 ("the Collateral, primarily undeveloped land, fails to generate any significant revenue to reduce the indebtedness or compensate the receiver for his or her services").

[9]   Wuest Declaration, ¶¶ 16-17.

[10]   A copy of the default notice is annexed to the Wuest Declaration as Exhibit M .  The Debtor admitted in the New Mexico suit that the Loan matured on July 9, 2009 and it failed to repay it.  *See* State Court Answer, ¶ 15.

[11]   *See* Wuest Declaration, ¶ 40.

Barclays' loan and continue with its development of the Real Property. Instead, the Debtor never obtained a refinancing and has performed extremely limited development of the Real Property. Since the original 2006 loan, the Debtor has developed and sold approximately 2,000 acres of the approximately 57,000 acres acquired by the Debtor and pledged to Barclays. Of the remaining 55,000 acres now owned by the Debtor, the Debtor has developed only 334 lots (48.87 acres).[12]

9. The Debtor's plans apparently failed in part because it has been unable to finance infrastructure improvements for its ambitious development plans. The Debtor appears to have counted on as much as $408 million of public financing for infrastructure costs, through tax increment development districts ("TIDDs") on the Real Property that would issue public bonds secured by future tax receipts to reimburse the Debtor for infrastructure improvements. The New Mexico legislature twice rejected the bonds to finance the TIDDs, in 2008 and 2009, depriving the Debtor of a principal financing source for its development costs.[13] The Debtor's inability to fund infrastructure is a recurring failure in this project: A promising opportunity to sell 75 to 100 acres to the Albuquerque Public Schools ("APS") for a school and sports stadium has evidently foundered on the Debtor's lack of funds to build infrastructure it had long

---

[12] *Id.* at ¶¶ 33, 52. Barclays commissioned three recent appraisals of the "as is" market value of the Real Property, with effective dates of July 24, 2009 (the "CBRE Appraisal"), November 31 [sic], 2009 (the "C&W Appraisal"), and February 12, 2010 (the "Integra Appraisal"), with the Integra Appraisal reviewing and reconciling the prior two appraisals. Copies of the three appraisals are annexed to the Wuest Declaration as Exhibits N, O, and P, respectively. The Integra Appraisal concluded that 334 lots were "completed" and 54,429.97 acres of the Real Property remained undeveloped. *See* Integra Appraisal, at 8. The CBRE Appraisal referred to the 334 lots as comprising approximately 48.87 acres. *See* CBRE Appraisal at 1.

[13] *See* "SunCal loses, Goodman triumphs in TIDD votes," New Mexico Business Weekly, March 23, 2009 ("Without the TIDD, SunCal likely not be able to start infrastructure work on its 57,000 acres, acquired from Westland Development, on Albuquerque's Westside"); "SunCal 'Considering All Options,'" ABQ Journal, March 24, 2009 ("The bill would have authorized SunCal's tax increment development districts – or TIDDs – to sell bonds worth $408 million to reimburse the company for roads sewers and other public infrastructure it would build within the district") – copies of which are annexed hereto as Exhibit 10.

promised APS, prompting APS to look elsewhere and to state publicly that it saw the Debtor "stalling" on the sale.[14] The Debtor also owes an unfulfilled commitment to the City of Albuquerque to build drainage infrastructure in a subdivision, which the City has extended six times since 1998, with the current deadline expiring in just a few weeks (May 10, 2010).[15]

10. And the Albuquerque press reported on March 25, 2010 that the Debtor's longtime manager of the Real Property, Will Steadman, resigned effective April 5 – the date of this chapter 11 filing.[16]

11. The Debtor continues to wax poetic in its grandiose plans for the Real Property, declaring it "enormous and unprecedented" and that it "will create, essentially, a new town within the City of Albuquerque" with "burgeoning residential, commercial and industrial areas" and "tens of thousands of new residents."[17] The Court should not be fooled by this rhetoric and should recognize that this is a failed real estate project that must now be turned over to its secured lender. There are no other assets to distribute. The Debtor should not have wasted the Court's time and resources by filing this case.

---

[14] *See* Reply in Support of Verified Application to Appoint Receiver, filed by Barclays in the New Mexico Foreclosure Suit on March 29, 2010 (the "Receiver Reply Brief"), a copy of which is annexed hereto as Exhibit 11, at Exhibit A thereto (APS public minutes from meeting on February 16, 2010: "when the offer was changed from 75 acres to 100 acres that was when SunCal began stalling the purchase agreement"). "SunCal" refers to The SunCal Companies, an affiliate of which has served as the development company managing the property since its acquisition in 2006.

[15] *See* Subdivision Improvements Agreement-Public and/or Private, dated June 11, 1996, and related extensions and liens (the "Subdivision Improvement Agreement"), copies of which are annexed hereto as Exhibit 12.

[16] *See* "SunCal's Steadman succeeds John Lewinger," New Mexico Business Weekly, March 25, 2010, a copy of which is annexed hereto as Exhibit 13.

[17] *See* Cook Declaration, ¶ 8.

### III. FACTUAL BACKGROUND[18]

12. On April 5, 2010 (the "Petition Date"), the Debtor filed a voluntary petition for relief under the United States Bankruptcy Code (11 U.S.C. §§ 101 et seq.) (the "Bankruptcy Code").

**A. The Loan**

13. On December 7, 2006, Barclays entered into a Loan Agreement (the "Original Loan Agreement") with Westland Development Co., Inc. ("Westland Development"), the Debtor's predecessor in interest, pursuant to which Barclays agreed, subject to all of the terms of the Loan Agreement, to lend Westland Development the principal amount of $212,320,000.00 (the "Loan").[19]

14. Coincident with the execution of the Loan Agreement, Westland Development "pledged the [Real Property] and miscellaneous other personal property to Barclays as security for the Loan."[20] Westland Development thereafter assigned the Real Property and all of its

---

[18] Based on the admissions made by the Debtor in its State Court Answer, the Cook Declaration and the Cook State Court Affidavit, and the Debtor's failure to dispute any of Barclays' central allegations, the material facts relevant to the disposition of this Motion are not subject to reasonable dispute. In its State Court Answer, the Debtor expressly admitted the majority of Barclays' material allegations – including that it executed the mortgage and loan documents and failed to repay the Loan at maturity – and did not dispute ("neither admits nor denies") most of the remaining allegations. Under New Mexico state law, the Debtor's failure to provide specific evidence contesting Barclays' allegations made the foreclosure suit ripe for summary judgment. *See* Reply by Barclays Capital Real Estate Inc. in Support of Motion for Summary Judgment against Westland DevCo, LP, filed in the New Mexico foreclosure suit on March 31, 2010 (the "Summary Judgment Reply Brief"), a copy of which is annexed hereto as Exhibit 14, at 8-9.

In fact, the sole factual allegations that the Debtor specifically contested in the foreclosure suit were the amount of default interest – which Barclays showed to be overstated by 0.0014%, equal to $1,136.44 in the context of a $188 million debt (as of the suit's filing in December 2009) – and whether a receiver should be appointed. The Debtor failed, however, to offer any figures for what it thought the interest amount or other elements of Barclays' claim should be. *See generally*, Summary Judgment Reply Brief and Receiver Reply Brief.

[19] Wuest Declaration, ¶¶ 11, 15. *See also* Cook Declaration, ¶ 10; New Mexico Foreclosure Complaint, ¶¶ 12, 16; State Court Answer, ¶ 12, 16.

[20] Wuest Declaration, ¶¶ 11, 18-19. *See also* Cook Declaration, ¶ 10; New Mexico Foreclosure Complaint, ¶¶ 12, 20-21; State Court Answer, ¶ 12, 20-21.

7

obligations under the Loan Agreement to the Debtor, and the Debtor expressly assumed Westland Development's obligations under the Loan Agreement.[21]

15. Barclays timely and properly perfected its security interests in the Real Property and the Debtor's other assets by making appropriate filings with the relevant recording offices.[22]

16. The Debtor was structured as a single-purpose entity ("SPE") the sole purpose of which was to hold and develop the Real Property. Barclays lent on this basis, and both the loan documents and the organizational documents of the Debtor and its general partners were specifically designed to preserve the Debtor as a single-asset SPE with no other business.[23]

17. The Debtor's obligations under the Loan Agreement were originally scheduled to mature on December 7, 2007, and the Debtor exercised an option under the Loan Agreement to extend the maturity date to June 6, 2008. Barclays agreed to further extend the maturity date three times: first to July 7, 2008 and July 16, 2008 as part of forbearance discussions, and then to July 9, 2009 under the Amended Loan Agreement.[24]

---

[21] Wuest Declaration, ¶ 12. *See also* New Mexico Foreclosure Complaint, ¶ 13 (describing the "Drop Down"); State Court Answer, ¶ 13.

[22] Wuest Declaration, ¶¶ 18-30. *See also* New Mexico Foreclosure Complaint, ¶ 20-33; State Court Answer, ¶ 20-33.

[23] Wuest Declaration, ¶ 13. *See* Amended Loan Agreement, § 4.18 (SPE representations and covenants for the Debtor and its general partners); § 5.2(h) (negative covenant that the Debtor "shall not enter into any line of business other than the ownership and operation of the Property"); § 1.1 (defining "Property" as the Real Property and all other assets covered by Barclays' Mortgage). *See also* Amended and Restated Limited Partnership Agreement of the Debtor, a copy of which was provided to Barclays at the closing of the 2006 loan and is annexed to the Wuest Declaration as Exhibit J, at § 2.4(a)-(b) (restricting Debtor's business to development and management of the Real Property and related personal property, and requiring Barclays' consent (as Lender) to "engage in any other business or activity" while the Loan is outstanding).

[24] Wuest Declaration, ¶¶ 16-17; Amended Loan Agreement, § 1.1, p. 17 (definition of "Maturity Date"); *id.* at § 2.3(b), p. 33 (requiring the Debtor to pay all outstanding sums owing under the Loan Documents on the Maturity Date).

18. The Debtor admitted in the New Mexico foreclosure suit that it failed to repay the Loan on the maturity date.[25]

19. The Debtor now admits that, as of the Petition Date, it owes Barclays at least $181,775,168.03 on the Loan, which it describes solely as the principal balance, without providing any figures for interest, fees and other amounts due.[26]

20. Barclays asserts that the total amount owed on the Loan as of the Petition Date is $194,258,208.66, plus attorneys' fees and collection costs.[27]

B. **The Debtor Lacks Any Equity and Has No Unencumbered Assets to Pay Creditors**

21. Barclays respectfully submits that there is no need to resolve the total claim amount since, even using the Debtor's principal-only balance ($181,775,168.03), the Debtor is severely "under water" and lacks any equity in the Real Property. The three appraisals Barclays recently obtained of the Real Property resulted in appraised market values of $95 million (as of July 24, 2009), $148.1 million (as of November 31 [sic], 2009), and $112 million (as of February 12, 2010), with the final appraisal commissioned to review and reconcile the prior two appraisals.[28] Even taking the highest appraised values ($148.1 million) and the lowest of Barclays' admitted claim ($181,775,168.03), this results in Barclays being undersecured by more than $33 million ($33,675,168.03). Using the range of the three appraisals, Barclays' unsecured deficiency claim is at least $33,675,168.03 to $86,775,168.03 (using the Debtor's admitted

---

[25] State Court Answer, ¶ 15.

[26] Cook Declaration, ¶ 13.

[27] This figure consists of $181,174,186.67 in principal; $12,129,702.38, in accrued and unpaid interest, $908,875.82 in exit fees, and $45,443.79 in late fees, for a total of $194,258,208.66, plus attorneys' fees and costs and expenses of collection. Wuest Declaration, ¶ 40.

[28] *See* the CBRE Appraisal ($95 million), C&W Appraisal ($148.1 million), and Integra Appraisal ($112 million). The appraisals were of the "as is" market value of the Real Property as of their stated effective dates. There is no basis for valuing the Real Property or "Project," almost all of which is vacant land, as a going concern.

9

principal-only claim amount), and more likely ranging from $46,158,208.67 to $99,258,208.67 (using Barclays' full claim amount). And coupling Barclays' minimum, principal-only deficiency claim ($33,675,168.03) with the Debtor's asserted other unsecured claims of $4,671,984.77,[29] the Debtor has *at least* $38,347,152.80 in unsecured claims – of which Barclays' unsecured claim (excluding interest, costs, fees and expenses) is by far the largest (87.8%).

22. Given Barclays' recent appraisals, the Debtor's asserted value for the Real Property ("land and development costs"), $352,511,243.74,[30] is simply not plausible. This figure suggests that the Debtor could be providing this Court with the *book value* of the Real Property as of the Petition Date. The Debtor provides no explanation. Given the recent appraisals obtained by Barclays it is extremely likely that the Debtor's value assertion is grossly inflated and *not* an accurate indicator of the Real Property's value to the Debtor, Barclays or anyone else.

23. It is also not plausible for the Debtor to state, before this Court, that it has over $8 million in other assets, besides the Real Property.[31] The Debtor admits that it has *less than $4,000* in cash, does not identify or describe the purported $3.8 million in "restricted cash," and fails to account at all for the remaining $4.2 million balance ($4,246,756.90) of its claimed total assets of over $360 million. Compare these purported "other," non-Real Property assets, assertedly worth over $8 million, with the Debtor's sworn affidavit on March 8, 2010, filed in the New Mexico suit, that it "owns no goods or other movable personal property."[32]

---

[29] Cook Declaration, ¶ 14. Barclays restates the Debtor's figure for argument, and does not concede that this figure for the Debtor's other unsecured claims is accurate.

[30] Cook Declaration, ¶ 9.

[31] *Id.* (showing a difference between the total stated assets and the asserted value of the Real Property of $8,097,764.94).

[32] Cook State Court Affidavit, ¶ 14.

24. A comparison of the Debtors' total stated assets ($360,609,008.68) to its total stated liabilities ($197,575,948.23)[33] again begs the question of what this Debtor is doing in chapter 11 if it is allegedly solvent by an "equity cushion" of $163 million (the difference of these two figures). The only honest answers are that the Debtors' valuation of its own assets is unreliable, and the real reason for this chapter 11 filing was to thwart Barclays' state court litigation. The Debtor admits as much, stating in its first-day declaration:

> In order to avoid the expense, distraction and uncertainty of litigation and, more importantly, to efficiently and effectively restructure the outstanding indebtedness and maximize value for all stakeholders, the Debtor filed a Chapter 11 petition.[34]

25. The problem with the Debtor's restructuring theory is that there are *no assets available to pay any creditors other than Barclays*. As the Debtor has admitted, its sole material asset is the Real Property, which it mortgaged to Barclays. Barclays' mortgage also covers all personal property related to the Real Property, including all additional lands, estates and development rights; improvements on the Real Property; easements and rights of way; equipment; fixtures; rents; condemnation awards; insurance proceeds; tax refunds; litigation rights; contracts, permits and project documents; intellectual property; building materials and other personal property, wherever located, to be used in the Real Property; all other personal property owned by the Debtor that is located within or about the Real Property; and all proceeds of the foregoing and any other rights of the Debtor in the foregoing.[35]

---

[33] Cook Declaration, ¶ 9.

[34] *Id.* at ¶ 20.

[35] Mortgage, §§ 1.1-1.2. *See also* the Assignment of Rents, Assignment of Project Documents, and other personal property pledges described in the New Mexico Foreclosure Complaint, ¶¶ 23-44.

11

26. Thus, this chapter 11 case is, at bottom, little more than a two-party dispute between the Debtor and its secured lender. This dispute was on the verge of being resolved in its proper forum, the New Mexico state court, before the Debtor's bankruptcy filing on April 5.

C. **The Debtor has No Operating Income**

27. The Debtor lacks any meaningful source of income, having admitted both in this Court and the New Mexico litigation that its liquid assets are *de minimis* and that its income in 2009 was "insignificant" (less than $50,000) and is expected to *decline* in 2010.[36] The Debtor's 13-week budget submitted to this Court, as an exhibit to its first-day declaration, shows a "Total Receipts" line that is *blank* for the entire period.[37] In other words, the Debtor has *no business revenues.*

28. The Debtor is effectively administratively insolvent. It essentially admits this fact, as the only apparent source of funding for the Debtor's post-petition operations is the alleged willingness of one of its limited partners, D. E. Shaw Real Estate Portfolios 1, L.L.C. ("DESCO") – albeit uncommitted and entirely discretionary – to make certain limited equity contributions to fund expenses.[38] Although the Debtor's first-day declaration states that DESCO's contribution is "reflected in the budget,"[39] DESCO's name appears nowhere on the attached budget and the reader is left to surmise that DESCO's equity contribution is subsumed in the "Borrower Project Funding" line.

29. The Debtor's proffered budget is revealing: notwithstanding the Debtor's soaring rhetoric of development plans for "a new town within the City of Albuquerque," the Debtor

---

[36] Cook State Court Affidavit, ¶ 14.

[37] Cook Declaration, Exhibit A ("Westland DevCo LP Post-Petition Budget").

[38] Cook Declaration, ¶ 22.

[39] *Id.*

12

appears to have no money and no plans to conduct any *development* operations at all. Instead, the Debtor's post-petition budget devotes over half of its expenses to staff and administrative overhead ($1,101,606, or 46%) and bankruptcy-related expenses ($110,000, or 5%).[40] The balance ($1,169,284, or 49%) is titled "Land Preservation Expenses," with no indication that any of them are going to actual construction or other development activity. The Debtor is apparently proposing to do the minimum to keep the Real Property in a state of suspended animation while it drags out its litigation with Barclays. And it goes without saying that the Debtor's budget does not include any amounts for post-petition adequate protection payments to Barclays.

**D.  The Debtor Is Damaging the Value of Barclays' Collateral**

30. While this dispute remains unresolved, leaving the Debtor in control of the Real Property risks further damage to Barclays' collateral. The Debtor suggests that it is taking steps to develop the Real Property, but its recent acts and omissions – and its demonstrated lack of funds to pay for development activities – show that the Debtor's mismanagement threatens to further harm the value of the Real Property.

31. The most basic evidence of the Debtor's failure is its inability to develop the Real Property. As noted above, the Barclays loan was intended as a bridge loan with a short maturity, when the Debtor would then refinance the loan in order to continue its development activities. None of this ever materialized, other than the original Barclays "bridge" loan. The Debtor failed to obtain a refinancing. It failed to obtain New Mexico legislative approval for as much as $408 million in infrastructure financing through the TIDDs.[41] It appears to have ceased its

---

[40] The Debtor disclosed that its proposed bankruptcy professionals have already received retainers of over $1.6 million prior to the Petition Date. *See* retention applications for Cole, Schotz, Meisel, Forman & Leonard, P.A. (Docket No. 9), ¶ 12 (retainer of $750,000); Katten Muchin Rosenman LLP (Docket No. 10), ¶ 19 (retainer of $150,000); and Navigant Capital Advisors, LLC (Docket No. 16) ¶ 18 (retainer of $750,825). It is unclear whether these payments came from Barclays' cash collateral.

[41] *See supra* ¶ Paragraph 9 and accompanying notes.

construction and development activities altogether.  Since it acquired the Real Property over three years ago, consisting of approximately 57,000 acres, the Debtor has developed and sold approximately 2,000 acres.  Of the remaining approximately 55,000 acres, the Debtor has developed less than 50 acres (334 lots) and the remaining 54,429.97 acres remain vacant.[42]  Notwithstanding the Debtor's ambitious plans, this real estate project has failed.

32.     More recent, specific instances of the Debtor's mismanagement are described above and in Barclays' New Mexico state court pleadings: (1) The Debtor has failed to construct infrastructure improvements in a subdivision that its predecessor-in-interest, Westland Development, committed to the City of Albuquerque over a decade ago (in 1996), prompting the City to extend the original completion deadline (May 31, 1998) six times, most recently to May 10, 2010;[43] (2) the Debtor has jeopardized a significant proposed tract purchase by APS (discussed below); and (3) the Debtor's longtime local manager, Will Steadman, announced that he was resigning from managing the Real Property effective April 5, 2010. [44]

33.     The APS project is a recent example of the Debtor's inability to follow through on its long-standing infrastructure commitments.  APS and the Debtor's predecessor, Westland Development, entered into an option agreement in 2003, under which APS held an option to purchase a 75-acre tract that it intended to use for a school.[45]  The option agreement obligated the Debtor to pay for its "pro rata share" of infrastructure costs related to the proposed tract

---

[42] *See supra* ¶ Paragraph 8 and accompanying notes.

[43] *See* Subdivision Improvements Agreement.

[44] *See supra* ¶ Paragraph 10 and accompanying notes.

[45] Option Agreement, dated September 2, 2003, between APS and Westland Development, the Debtor's predecessor-in-interest (the "APS Option Agreement"), a copy of which, including amendments, was provided to Barclays and is annexed to the Wuest Declaration as Exhibit Q;

purchase, with such costs to be determined by a later engineering estimate and allocated between the Debtor and APS.[46]

34. The Debtor later informed Barclays that APS was also interested in purchasing an additional 25 acres for a sports stadium, increasing the proposed tract purchase to 100 acres.[47] Barclays then tried for several months, without success, to get an accurate estimate from the Debtor of what its share of the infrastructure costs for both the 75-acre and 100-acre tracts would be – and how the Debtor intended to pay for them given its current financial condition – but has not received any such information from the Debtor.[48]

35. Barclays then discovered from recent press reports that a capital outlay committee of APS recently voted to seek an alternative site for the proposed stadium – a fact that has been confirmed by a review of that committee's publicly available minutes. The minutes reveal, moreover, that APS considered the Debtor to be "stalling" on the tract purchase.[49] Barclays then tried to arrange a meeting with both the Debtor and APS to get further information on the proposed purchase and specifically on the Debtor's potential infrastructure obligations. In response, the Debtor informed Barclays that such a meeting was not necessary and declined to arrange it.[50]

36. The tale of the APS transaction demonstrates Barclays' predicament: Any potential opportunities for developing the Real Property go to waste because of the Debtor's unwillingness or financial inability to pursue them. The Debtor is now the obstacle to realizing

---

[46] APS Option Agreement, § 4(d).

[47] Wuest Declaration, at ¶¶ 54-55. *See also* "APS to Move Forward on SW Stadium," ABQ Journal, March 18, 2010, a copy of which is annexed hereto as <u>Exhibit 15</u>.

[48] Wuest Declaration, at ¶¶ 56.

[49] *See* APS Minutes dated February 16, 2010 and March 2, 2010, copies of which are annexed to the Receiver Reply Brief as Exhibits "A" and "B" thereto.

[50] Wuest Declaration, at ¶ 57.

any remaining value of the Real Property, and is frankly abusing the bankruptcy process in a desperate attempt to retain control.

## IV. RELIEF REQUESTED

37. Barclays respectfully submits that this Court should promptly dismiss the Debtor's chapter 11 case, which was filed in bad faith for the primary purpose of frustrating Barclays' enforcement of its state law liens against the Real Property. As shown above, the Debtor has no equity in the Real Property and no reasonable prospects for reorganization.

38. It is well established that "[c]hapter 11 bankruptcy petitions are subject to dismissal under 11 U.S.C. § 1112(b) unless filed in good faith." *Official Comm. of Unsecured Creds. v. Nucor Corp.* (*In re SGL Carbon Corp.*), 200 F.3d 154, 160 (3d Cir. 1999). Moreover, once challenged, the Debtor bears the burden of proving that its petition was filed in good faith. *Id.* at 162 n.10.

39. The Third Circuit has generally focused on two issues in determining whether a bankruptcy petition was filed in good faith: "(1) whether the petition serves a valid bankruptcy purpose, e.g., by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the litigation is filed merely to obtain a tactical litigation advantage." *In re Integrated Telecom Express, Inc.*, 384 F.3d 108, 120 (3d Cir. 2004) (citing *SGL Carbon*). In this case, both factors weigh heavily in favor of dismissal.

40. The Cook Declaration offers two putative justifications for the Debtor's decision to commence a chapter 11 case at this time, neither of which withstands serious scrutiny.

41. First, Mr. Cook claims that the Debtor filed for bankruptcy protection "in order to avoid the expense, distraction and uncertainty of litigation and, more importantly, to efficiently and effectively restructure the outstanding indebtedness and maximize value for all

stakeholders."[51] The Debtors thus admittedly commenced this case in order to "avoid the expense, distraction and uncertainty" of continued litigation with Barclays.

42. As the Third Circuit recognized in *In re Integrated Telecom Express*, however, "the protection of the automatic stay is not *per se* a valid justification for a chapter 11 filing; rather, it is a consequential benefit of an otherwise good faith filing. A perceived need for the automatic stay, without more, cannot convert a bad faith filing to a good faith one." 384 F.3d at 128. The Debtor's hope and desire to short-circuit its state court litigation with Barclays is not a valid justification for a bankruptcy filing. *See In re 15375 Memorial Corp.*, 400 B.R. 420, 428 (D. Del. 2009) (concluding that "Debtors filed these petitions as a litigation tactic" where the Debtors filed for bankruptcy after "discovery was complete and trial was imminent.").

43. The Debtor's other proffered justification for being before this Court is equally indicative of bad faith. Mr. Cook claims that "[b]efore the bankruptcy filing, the Debtor thoroughly analyzed all of its available options and determined that filing for chapter 11 was necessary to preserve the value of its business as a going concern and assets for the benefit of all stakeholders and to explore possible alternatives for restructuring the Loan in a challenging real estate market."[52]

44. His assertion belies the moribund state of the Debtor's business and affairs. The Debtor, by its own admission, has no income, no foreseeable prospects for a successful reorganization, and no meaningful assets to preserve for the benefit of creditors.

45. The Debtor's sole material asset, the Real Property, is fully encumbered by Barclays' liens. To the extent the Debtor has any other material assets, they are also subject to Barclays' mortgage, which covers all personal property related to the Real Property and all

---

[51] Cook Declaration, ¶ 20.

[52] *Id.* at ¶ 21.

proceeds.  The Debtor has no other assets with which to make a distribution to creditors.  With the Debtor financially (and practically) dead in the water, it is difficult to discern what value it is supposedly seeking to preserve by filing for bankruptcy – other than the "value" of delay and continued litigation before this Court.

46. The Debtor's first-day declaration continues to speak of grandiose plans for developing the Real Property, but the Bankruptcy Code requires more than speculative hope to support a finding of a good faith filing.  Barclays' rights as a secured creditor cannot and should not be held in abeyance indefinitely while the Debtor pursues some visionary development scheme that has utterly failed under the Debtor's management for the past three years.  *Little Creek Development Co. v. Commonwealth Mortgage Corp. (In re Little Creek Development Co.)*, 779 F.2d 1068, 1073 (5th Cir. 1986) ("Resort to the protection of the bankruptcy laws is not proper under these circumstances because there is no going concern to preserve, there are no employees to protect, and there is no hope of rehabilitation, except according to the debtor's 'terminal euphoria.'").

47. The Debtor's rhetoric aside, the real reason it filed this case is obvious from its timing: to obtain an unwarranted tactical litigation advantage, specifically, deferral of the New Mexico state court's consideration of Barclays' motions for summary judgment and motion for the appointment of a receiver, both of which were scheduled to be heard 45 minutes after the Debtor filed this case.  In all but name, this case presents a classic two-party dispute between the Debtor and its secured lender, which holds a lien on all of the Debtor's material assets.  The Debtor asserted no plausible defenses in the New Mexico foreclosure suit, and in fact admitted in its pleadings that all loan and security documents were valid, that the Loan matured on July 9, 2009, and that the Debtor failed to repay it.  Faced with the prospect of imminent summary

judgment and the appointment of a receiver in the New Mexico state court, the Debtor grasped for its last-ditch hope to delay the loss of its assets, a chapter 11 filing.

48.  The Court should dismiss this case immediately as a bad faith filing.

## V. CONCLUSION

WHEREFORE, Barclays respectfully requests entry of an Order dismissing this chapter 11 case, together with such other and further relief as this Court deems just and proper.

DATE: April 12, 2010                     Respectfully submitted,

        */s/ Kevin J. Mangan*
Francis A. Monaco, Jr. (No. 2078)
Kevin J. Mangan (No. 3810)
**WOMBLE CARLYLE SANDRIDGE & RICE, PLLC**
222 Delaware Avenue
Wilmington, Delaware 19801
(302) 252-4320
Telecopy: (302) 252-4330

Richard S. Miller
Jeffrey Rich
Eric Moser
**K&L GATES LLP**
599 Lexington Avenue
New York, NY  10022
(212) 536-3900
Telecopy: (212) 536-3901

ATTORNEYS FOR
BARCLAYS CAPITAL REAL ESTATE INC.