**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

-------------------------------------------------------------x

| | |
|---|---|
| In re: | : Chapter 11 Case |
| | : |
| WESTLAND DEVCO, LP, | : Case No. 10-11166 (CSS) |
| | : |
| | : Hearing Date: May 5, 2010, 9:00 a.m. |
| Debtor. | : Objection Deadline: April 28, 2010, 4:00 p.m. |

-------------------------------------------------------------x

**MOTION OF BARCLAYS CAPITAL REAL ESTATE INC. FOR ENTRY OF AN
ORDER: (A) GRANTING RELIEF FROM THE AUTOMATIC STAY, (B)
CONDITIONING ANY CONTINUATION OF THE STAY ON THE PROVISION OF
ADEQUATE PROTECTION; AND (C) CONFIRMING THAT THIS IS A SINGLE
ASSET REAL ESTATE CASE SUBJECT TO 11 U.S.C. § 362(d)(3)**

Barclays Capital Real Estate Inc. ("Barclays"), in its capacity as Agent and Lender under

that certain Amended and Restated Loan Agreement dated July 16, 2008 (as amended, the

"Amended Loan Agreement"),[1] hereby moves for the entry of an order: (i) modifying the

automatic stay pursuant to 11 U.S.C. § 362(d); (ii) directing Westland DevCo, LP ("DevCo LP"

or the "Debtor") to provide adequate protection to Barclays' lien in all assets of the Debtor (as

described below) pursuant to 11 U.S.C. § 363(e); and (iii) confirming that this is a single-asset

real estate case within the meaning of 11 U.S.C. § 362(d)(3) (the "Motion").  In support of the

Motion, Barclays states as follows:

## I.     JURISDICTION

1.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2.     This is a core proceeding within the meaning of 11 U.S.C. § 157(b)(2)(G).

---

[1]  *See* Wuest Declaration (defined below), a copy of which is annexed hereto as Exhibit 1, at Exhibit C
thereto (Amended Loan Agreement).  As noted below, all exhibits to the Wuest Declaration were
previously filed (Docket Nos. 24-26) and are incorporated herein by reference.

3. The statutory predicates for the relief requested herein are sections 362(d) and 363(e) of the United States Bankruptcy Code (11 U.S.C. §§ 101 et seq.) (the "Bankruptcy Code"), Rules 4001 and 9014 of the Federal Rules of Bankruptcy Procedure and Local Rule 4001-1 of this Court.

## II.     PRELIMINARY STATEMENT

4. Barclays has separately filed its Motion to Dismiss the Debtor's chapter 11 case pursuant to Section 1121(b) of the Bankruptcy Code, dated April 12, 2010 (Docket No. 23) (the "Motion to Dismiss"), and the supporting Declaration of Mark Wuest of Barclays, dated April 12, 2010 (Docket Nos. 24-26) (the "Wuest Declaration").  Barclays files this Motion as a request for alternative relief if the Court is not inclined to dismiss this case.  This Preliminary Statement (Section II) and the Factual Background (Section III) are restated from the Motion to Dismiss for convenience, and are identical except for (i) additional Paragraph 13 hereof requesting alternative relief, (ii) clarifying that all exhibit references are to the exhibits to the Motion to Dismiss (Exhibits 1-15), all of which are incorporated herein by reference, and (iii) adding three sentences to the end of Paragraph 23 hereof (and an accompanying exhibit) based on the April 13 status hearing, where the Debtor admitted that $4 million of its asserted unsecured claims are held by an insider of the Debtor.  The Wuest Declaration (Exhibit 1, without exhibits) is being filed with this Motion for convenience; all exhibits thereto are as previously filed (Docket Nos. 24-26) and are incorporated herein by reference.  This Motion also includes new Exhibits 16-17.

------------------

5. This chapter 11 case is a classic example of a single-asset real estate debtor that rushes to file a bankruptcy petition purely as a litigation tactic, to stave off imminent state court foreclosure and loss of control of the property.  The transparency of this tactic is shown by its

timing: The Debtor's loan originally matured on December 7, 2007, then the Debtor exercised an option to extend it to June 6, 2008, and then Barclays agreed to further extend it three times: first to July 7, 2008 and July 16, 2008 as part of forbearance discussions, and then to July 9, 2009 under the Amended Loan Agreement.[2] The Debtor failed to pay the loan on this final maturity date, prompting Barclays to file its foreclosure suit in New Mexico state court on December 15, 2009,[3] and motions for summary judgment against the Debtor and for the appointment of a receiver on February 19, 2010.[4] The two motions were scheduled for hearing before the New Mexico state court on April 5, 2010, at 2:00 p.m. (Mountain) / 4:00 p.m. (Eastern). The Debtor filed its chapter 11 petition at 1:16 p.m. (Mountain) / 3:16 p.m. (Eastern) on April 5, 2010 – 45 minutes before the New Mexico state court hearing.[5]

6.    The Debtor is obviously using the chapter 11 process to thwart the state court litigation, which Barclays filed to enforce its rights and finally bring this failed project to an end. As demonstrated below, the Debtor admits that it has no meaningful income (less than $50,000 per year) and less than $4,000 in available cash, and offers this Court a wildly optimistic valuation of its sole real estate asset ($353 million) that is three times the value of Barclays' recent appraisals of the property. The Debtor refuses to be candid with this Court that it is severely "under water" on a project that it has been unable to develop since it acquired the property over

---

[2]   Wuest Declaration, ¶¶ 16-17.

[3]   *Barclays Capital Real Estate Inc. v. Westland DevCo, LP, et al.*, Case No. CV-2009-14749, Second Judicial District Court, County of Bernalillo, State of New Mexico (the "New Mexico Foreclosure Suit"). A copy of Barclays' complaint in the New Mexico Foreclosure Suit (the "State Court Complaint"), without exhibits (most of which are attached to the Wuest Declaration), is annexed to the Motion to Dismiss as Exhibit 2.

[4]   Copies of Barclays' summary judgment and receiver motions are annexed to the Motion to Dismiss as Exhibit 3 and Exhibit 4.

[5]   A copy of the April 5 hearing notice from the New Mexico Foreclosure Suit is annexed to the Motion to Dismiss as Exhibit 5. A copy of the page from the Court's website showing the time of the filing of this case is annexed to the Motion to Dismiss as Exhibit 6.

three years ago.  The Court should not countenance the Debtor's abuse of the bankruptcy process to forestall the inevitable and should promptly dismiss this case.

7.      The only property at issue is the Debtor's sole asset: approximately 55,000 acres of largely undeveloped land in Albuquerque, New Mexico (the "Real Property").  *All* of this real property, and all personal property related to this tract, is pledged to Barclays as security for its 2006 loan, which the Debtors admitted in its answer to the New Mexico foreclosure suit.[6]  The Debtor has also admitted, in this Court and the New Mexico state court, that it has no other material assets and *de minimis* cash flow.[7]  As the Debtor's Executive Vice President stated in a sworn affidavit filed to oppose Barclays' New Mexico suit:

> The appointment of a receiver also is unnecessary because the income derived from the Project pales in comparison to the total amount of the Loan.  Barclays alleges that it is owed more than $188,818,418.71 from DevCo.  *In 2009, however, the Project generated less than $50,000 in income*.  Therefore, DevCo's 2009 Property-related income constituted less than .01% of the Loan, a sum too insignificant to justify the receiver's anticipated costs and expenses.  *The projected income for 2010 will be less than what DevCo received in 2009*.  DevCo also owns no goods or other movable personal property for the receiver to seize.[8]

---

[6]   Copies of Barclays' mortgage and related amendments with respect to the Real Property and related personal property (collectively, the "Mortgage") are annexed to the Wuest Declaration as Exhibit A and Exhibit E.  *See also* the Debtor's Answer to the State Court Complaint, filed on January 29, 2010 (the "State Court Answer"), a copy of which is annexed to the Motion to Dismiss as Exhibit 7, ¶¶ 9-31 (admitting Barclays' loan and that the Debtor executed the Mortgage and various other security agreements).

[7]    *See* Declaration of Bruce V. Cook in Support Debtor's Chapter 11 Petition (the "Cook Declaration"), a copy of which is annexed to the Motion to Dismiss for convenience as Exhibit 8, ¶ 9 (describing the Debtor's assets as $360.6 million, almost all of which consists of unspecified "land and development costs" ($352,511,243.75), and listing a *de minimis* amount of cash ($3,910.19) and "restricted cash" of $3.8 million which it does not identify or describe).  The Debtor fails to account for a balance of $4.246,756.90 in its figure for total assets.

[8]   Affidavit of Bruce Cook in Opposition to Application for Appointment of Receiver and in Opposition to Plaintiff's Motion for Partial Summary Judgment, dated March 8, 2010 and filed in the New Mexico foreclosure suit on March 9, 2010 (the "Cook State Court Affidavit"), a copy of which is annexed to the Motion to Dismiss as Exhibit 9, ¶ 14 (emphasis supplied).  *See also Id.* at ¶ 5 ("the Property generates no significant rent or other income to protect or to pay for a receivership"); State Court Answer, ¶ 64 ("the Collateral, primarily undeveloped land, fails to generate any significant revenue to reduce the indebtedness or compensate the receiver for his or her services").

4

8.     The Debtor's words speak for themselves.  Its own admission that it has no material assets besides the Real Property – all of which is pledged to Barclays – and that even its miniscule cash flow is *declining*, begs the question of what it hopes to accomplish by this chapter 11 filing.  The Court should know that Barclays has spent much of the past *two years* attempting to restructure this loan with the Debtor.  As noted above, the loan originally matured on December 7, 2007 and has been extended several times, finally to July 9, 2009.[9]  When this final maturity date came and went with no payment or meaningful restructuring proposal by the Debtor, Barclays sent a default notice on August 17, 2009.[10]  With no change in the status quo during the fall of 2009, Barclays finally filed its foreclosure suit in New Mexico on December 15, 2009, and its motions for summary judgment and for the appointment of a receiver on February 19, 2010.  A hearing was set for the afternoon of April 5, 2010, which the Debtor stayed through this chapter 11 filing.

9.     In the meantime, Barclays has steadily watched its claim against the Debtor increase – as of the chapter 11 petition date, it stood at $194,258,208.66[11] – and its collateral decline in value.  The Debtor's original plan was to use the Barclays loan only as a bridge loan: the Debtor used the proceeds to acquire the Real Property in 2006, and the loan had a limited maturity of one year with a six-month option to extend, after which it was expected to refinance Barclays' loan and continue with its development of the Real Property.  Instead, the Debtor never obtained a refinancing and has performed extremely limited development of the Real Property.

---

[9]   Wuest Declaration, ¶¶ 16-17.

[10]   A copy of the default notice is annexed to the Wuest Declaration as <u>Exhibit M </u>.  The Debtor admitted in the New Mexico suit that the Loan matured on July 9, 2009 and it failed to repay it.  *See* State Court Answer, ¶ 15.

[11]   *See* Wuest Declaration, ¶ 40.

Since the original 2006 loan, the Debtor has developed and sold approximately 2,000 acres of the approximately 57,000 acres acquired by the Debtor and pledged to Barclays. Of the remaining 55,000 acres now owned by the Debtor, the Debtor has developed only 334 lots (48.87 acres).[12]

10.     The Debtor's plans apparently failed in part because it has been unable to finance infrastructure improvements for its ambitious development plans. The Debtor appears to have counted on as much as $408 million of public financing for infrastructure costs, through tax increment development districts ("TIDDs") on the Real Property that would issue public bonds secured by future tax receipts to reimburse the Debtor for infrastructure improvements. The New Mexico legislature twice rejected the bonds to finance the TIDDs, in 2008 and 2009, depriving the Debtor of a principal financing source for its development costs.[13] The Debtor's inability to fund infrastructure is a recurring failure in this project: A promising opportunity to sell 75 to 100 acres to the Albuquerque Public Schools ("APS") for a school and sports stadium has evidently foundered on the Debtor's lack of funds to build infrastructure it had long promised APS, prompting APS to look elsewhere and to state publicly that it saw the Debtor "stalling" on the

---

[12]    *Id.* at ¶¶ 33, 52. Barclays commissioned three recent appraisals of the "as is" market value of the Real Property, with effective dates of July 24, 2009 (the "CBRE Appraisal"), November 31 [sic], 2009 (the "C&W Appraisal"), and February 12, 2010 (the "Integra Appraisal"), with the Integra Appraisal reviewing and reconciling the prior two appraisals. Copies of the three appraisals are annexed to the Wuest Declaration as Exhibits N, O, and P, respectively. The Integra Appraisal concluded that 334 lots were "completed" and 54,429.97 acres of the Real Property remained undeveloped. *See* Integra Appraisal, at 8. The CBRE Appraisal referred to the 334 lots as comprising approximately 48.87 acres. *See* CBRE Appraisal at 1.

[13]    *See* "SunCal loses, Goodman triumphs in TIDD votes," New Mexico Business Weekly, March 23, 2009 ("Without the TIDD, SunCal likely not be able to start infrastructure work on its 57,000 acres, acquired from Westland Development, on Albuquerque's Westside"); "SunCal 'Considering All Options,'" ABQ Journal, March 24, 2009 ("The bill would have authorized SunCal's tax increment development districts – or TIDDs – to sell bonds worth $408 million to reimburse the company for roads sewers and other public infrastructure it would build within the district") – copies of which are annexed to the Motion to Dismiss as Exhibit 10.

sale.[14]   The Debtor also owes an unfulfilled commitment to the City of Albuquerque to build

drainage infrastructure in a subdivision, which the City has extended six times since 1998, with

the current deadline expiring in just a few weeks (May 10, 2010).[15]

11.     And the Albuquerque press reported on March 25, 2010 that the Debtor's longtime

manager of the Real Property, Will Steadman, resigned effective April 5 – the date of this chapter

11 filing.[16]

12.     The Debtor continues to wax poetic in its grandiose plans for the Real Property,

declaring it "enormous and unprecedented" and that it "will create, essentially, a new town within

the City of Albuquerque" with "burgeoning residential, commercial and industrial areas" and

"tens of thousands of new residents."[17]   The Court should not be fooled by this rhetoric and

should recognize that this is a failed real estate project that must now be turned over to its secured

lender.   There are no other assets to distribute.   The Debtor should not have wasted the Court's

time and resources by filing this case.

13.     If the Court is not inclined to dismiss this case, Barclays asks, in the alternative,

that the stay be lifted so that it may enforce its liens; that it be paid adequate protection to protect

it against further decline in its collateral value; and that this case be classified as a single-asset real

estate (SARE) case under § 362(d)(3) of the Bankruptcy Code so that the Debtor is required to

---

[14]   *See* Reply in Support of Verified Application to Appoint Receiver, filed by Barclays in the New Mexico Foreclosure Suit on March 29, 2010 (the "Receiver Reply Brief"), a copy of which is annexed to the Motion to Dismiss as Exhibit 11, at Exhibit A thereto (APS public minutes from meeting on February 16, 2010: "when the offer was changed from 75 acres to 100 acres that was when SunCal began stalling the purchase agreement").   "SunCal" refers to The SunCal Companies, an affiliate of which has served as the development company managing the property since its acquisition in 2006.

[15]   *See* Subdivision Improvements Agreement-Public and/or Private, dated June 11, 1996, and related extensions and liens (the "Subdivision Improvement Agreement"), copies of which are annexed to the Motion to Dismiss as Exhibit 12.

[16]   *See* "SunCal's Steadman succeeds John Lewinger," New Mexico Business Weekly, March 25, 2010, a copy of which is annexed to the Motion to Dismiss as Exhibit 13.

[17]   *See* Cook Declaration, ¶ 8.

comply with the SARE mandate of a prompt, confirmable plan of reorganization or regular interest payments to Barclays.

### III.  FACTUAL BACKGROUND[18]

14.  On April 5, 2010 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under the United States Bankruptcy Code (11 U.S.C. §§ 101 et seq.) (the "<u>Bankruptcy Code</u>").

### A.  The Loan

15.  On December 7, 2006, Barclays entered into a Loan Agreement (the "<u>Original Loan Agreement</u>") with Westland Development Co., Inc. ("<u>Westland Development</u>"), the Debtor's predecessor in interest, pursuant to which Barclays agreed, subject to all of the terms of the Loan Agreement, to lend Westland Development the principal amount of $212,320,000.00 (the "<u>Loan</u>").[19]

16.  Coincident with the execution of the Loan Agreement, Westland Development "pledged the [Real Property] and miscellaneous other personal property to Barclays as security for

---

[18]  Based on the admissions made by the Debtor in its State Court Answer, the Cook Declaration and the Cook State Court Affidavit, and the Debtor's failure to dispute any of Barclays' central allegations, the material facts relevant to the disposition of this Motion are not subject to reasonable dispute. In its State Court Answer, the Debtor expressly admitted the majority of Barclays' material allegations – including that it executed the mortgage and loan documents and failed to repay the Loan at maturity – and did not dispute ("neither admits nor denies") most of the remaining allegations. Under New Mexico state law, the Debtor's failure to provide specific evidence contesting Barclays' allegations made the foreclosure suit ripe for summary judgment. *See* Reply by Barclays Capital Real Estate Inc. in Support of Motion for Summary Judgment against Westland DevCo, LP, filed in the New Mexico foreclosure suit on March 31, 2010 (the "<u>Summary Judgment Reply Brief</u>"), a copy of which is annexed to the Motion to Dismiss as <u>Exhibit 14</u>, at 8-9.

In fact, the sole factual allegations that the Debtor specifically contested in the foreclosure suit were the amount of default interest – which Barclays showed to be overstated by 0.0014%, equal to $1,136.44 in the context of a $188 million debt (as of the suit's filing in December 2009) – and whether a receiver should be appointed. The Debtor failed, however, to offer any figures for what it thought the interest amount or other elements of Barclays' claim should be. *See generally*, Summary Judgment Reply Brief and Receiver Reply Brief.

[19]  Wuest Declaration, ¶¶ 11, 15. *See also* Cook Declaration, ¶ 10; New Mexico Foreclosure Complaint, ¶¶ 12, 16; State Court Answer, ¶¶ 12, 16.

the Loan."[20]   Westland Development thereafter assigned the Real Property and all of its obligations under the Loan Agreement to the Debtor, and the Debtor expressly assumed Westland Development's obligations under the Loan Agreement.[21]

17.    Barclays timely and properly perfected its security interests in the Real Property and the Debtor's other assets by making appropriate filings with the relevant recording offices.[22]

18.    The Debtor was structured as a single-purpose entity ("SPE") the sole purpose of which was to hold and develop the Real Property.  Barclays lent on this basis, and both the loan documents and the organizational documents of the Debtor and its general partners were specifically designed to preserve the Debtor as a single-asset SPE with no other business.[23]

19.    The Debtor's obligations under the Loan Agreement were originally scheduled to mature on December 7, 2007, and the Debtor exercised an option under the Loan Agreement to extend the maturity date to June 6, 2008.  Barclays agreed to further extend the maturity date three

---

[20]   Wuest Declaration, ¶¶ 11, 18-19.  *See also* Cook Declaration, ¶ 10; New Mexico Foreclosure Complaint, ¶¶ 12, 20-21; State Court Answer, ¶¶ 12, 20-21.

[21]   Wuest Declaration, ¶ 12.  *See also* New Mexico Foreclosure Complaint, ¶ 13 (describing the "Drop Down"); State Court Answer, ¶ 13.

[22]   Wuest Declaration, ¶¶ 18-30.  *See also* New Mexico Foreclosure Complaint, ¶¶ 20-33; State Court Answer, ¶¶ 20-33.

[23]   Wuest Declaration, ¶ 13.  *See* Amended Loan Agreement, § 4.18 (SPE representations and covenants for the Debtor and its general partners); § 5.2(h) (negative covenant that the Debtor "shall not enter into any line of business other than the ownership and operation of the Property"); § 1.1 (defining "Property" as the Real Property and all other assets covered by Barclays' Mortgage).  *See also* Amended and Restated Limited Partnership Agreement of the Debtor, a copy of which was provided to Barclays at the closing of the 2006 loan and is annexed to the Wuest Declaration as <u>Exhibit J</u>, at § 2.4(a)-(b) (restricting Debtor's business to development and management of the Real Property and related personal property, and requiring Barclays' consent (as Lender) to "engage in any other business or activity" while the Loan is outstanding).

times: first to July 7, 2008 and July 16, 2008 as part of forbearance discussions, and then to July 9, 2009 under the Amended Loan Agreement.[24]

20. The Debtor admitted in the New Mexico foreclosure suit that it failed to repay the Loan on the maturity date.[25]

21. The Debtor now admits that, as of the Petition Date, it owes Barclays at least $181,775,168.03 on the Loan, which it describes solely as the principal balance, without providing any figures for interest, fees and other amounts due.[26]

22. Barclays asserts that the total amount owed on the Loan as of the Petition Date is $194,258,208.66, plus attorneys' fees and collection costs.[27]

**B.** **The Debtor Lacks Any Equity and Has No Unencumbered Assets to Pay Creditors**

23. Barclays respectfully submits that there is no need to resolve the total claim amount since, even using the Debtor's principal-only balance ($181,775,168.03), the Debtor is severely "under water" and lacks any equity in the Real Property. The three appraisals Barclays recently obtained of the Real Property resulted in appraised market values of $95 million (as of July 24, 2009), $148.1 million (as of November 31 [sic], 2009), and $112 million (as of February 12, 2010), with the final appraisal commissioned to review and reconcile the prior two appraisals.[28] Even taking the highest appraised values ($148.1 million) and the lowest of

---

[24] Wuest Declaration, ¶¶ 16-17; Amended Loan Agreement, § 1.1, p. 17 (definition of "Maturity Date"); *id.* at § 2.3(b), p. 33 (requiring the Debtor to pay all outstanding sums owing under the Loan Documents on the Maturity Date).

[25] State Court Answer, ¶ 15.

[26] Cook Declaration, ¶ 13.

[27] This figure consists of $181,174,186.67 in principal; $12,129,702.38, in accrued and unpaid interest, $908,875.82 in exit fees, and $45,443.79 in late fees, for a total of $194,258,208.66, plus attorneys' fees and costs and expenses of collection. Wuest Declaration, ¶ 40.

[28] *See* the CBRE Appraisal ($95 million), C&W Appraisal ($148.1 million), and Integra Appraisal ($112 million). The appraisals were of the "as is" market value of the Real Property as of their stated effective

Barclays' admitted claim ($181,775,168.03), this results in Barclays being undersecured by more than $33 million ($33,675,168.03). Using the range of the three appraisals, Barclays' unsecured deficiency claim is at least $33,675,168.03 to $86,775,168.03 (using the Debtor's admitted principal-only claim amount), and more likely ranging from $46,158,208.67 to $99,258,208.67 (using Barclays' full claim amount). And coupling Barclays' minimum, principal-only deficiency claim ($33,675,168.03) with the Debtor's asserted other unsecured claims of $4,671,984.77,[29] the Debtor has *at least* $38,347,152.80 in unsecured claims – of which Barclays' unsecured claim (excluding interest, costs, fees and expenses) is by far the largest (87.8%). The Debtor admitted at the April 13 status hearing that $4 million of its asserted other unsecured claims is owed to "an insider entity,"[30] which if excluded from the above figures leaves non-insider unsecured claims of *at least* $34,347,152.80 – of which Barclays' minimum unsecured claim (excluding interest, costs, fees and expenses) comprises almost the entirety (98.0%). If Barclays' full claim amount and range of likely deficiency claims are used, then total unsecured, non-insider claims range from $46,830,193.44 to $99,930,193.44, of which Barclays' claim share is yet higher (98.6% to 99.3%). Barclays' predominance of unsecured, non-insider claims further reinforces that this case is essentially a two-party dispute.

24. Given Barclays' recent appraisals, the Debtor's asserted value for the Real Property ("land and development costs"), $352,511,243.74,[31] is simply not plausible. This figure suggests that the Debtor could be providing this Court with the *book value* of the Real Property as

dates. There is no basis for valuing the Real Property or "Project," almost all of which is vacant land, as a going concern.

[29] Cook Declaration, ¶ 14. Barclays restates the Debtor's figure for argument, and does not concede that this figure for the Debtor's other unsecured claims is accurate.

[30] *See* Transcript of April 13, 2010 status hearing in this case (the "April 13 Hearing Transcript"), a copy of which is annexed hereto as Exhibit 16, at 5.

[31] Cook Declaration, ¶ 9.

of the Petition Date. The Debtor provides no explanation. Given the recent appraisals obtained by Barclays it is extremely likely that the Debtor's value assertion is grossly inflated and *not* an accurate indicator of the Real Property's value to the Debtor, Barclays or anyone else.

25.     It is also not plausible for the Debtor to state, before this Court, that it has over $8 million in other assets, besides the Real Property.[32] The Debtor admits that it has *less than $4,000* in cash, does not identify or describe the purported $3.8 million in "restricted cash," and fails to account at all for the remaining $4.2 million balance ($4,246,756.90) of its claimed total assets of over $360 million. Compare these purported "other," non-Real Property assets, assertedly worth over $8 million, with the Debtor's sworn affidavit on March 8, 2010, filed in the New Mexico suit, that it "owns no goods or other movable personal property."[33]

26.     A comparison of the Debtors' total stated assets ($360,609,008.68) to its total stated liabilities ($197,575,948.23)[34] again begs the question of what this Debtor is doing in chapter 11 if it is allegedly solvent by an "equity cushion" of $163 million (the difference of these two figures). The only honest answers are that the Debtors' valuation of its own assets is unreliable, and the real reason for this chapter 11 filing was to thwart Barclays' state court litigation. The Debtor admits as much, stating in its first-day declaration:

> In order to avoid the expense, distraction and uncertainty of litigation and, more importantly, to efficiently and effectively restructure the outstanding indebtedness and maximize value for all stakeholders, the Debtor filed a Chapter 11 petition.[35]

---

[32]    *Id.* (showing a difference between the total stated assets and the asserted value of the Real Property of $8,097,764.94).

[33]    Cook State Court Affidavit, ¶ 14.

[34]    Cook Declaration, ¶ 9.

[35]    *Id.* at ¶ 20.

27.     The problem with the Debtor's restructuring theory is that there are *no assets available to pay any creditors other than Barclays*.  As the Debtor has admitted, its sole material asset is the Real Property, which it mortgaged to Barclays.  Barclays' mortgage also covers all personal property related to the Real Property, including all additional lands, estates and development rights; improvements on the Real Property; easements and rights of way; equipment; fixtures; rents; condemnation awards; insurance proceeds; tax refunds; litigation rights; contracts, permits and project documents; intellectual property; building materials and other personal property, wherever located, to be used in the Real Property; all other personal property owned by the Debtor that is located within or about the Real Property; and all proceeds of the foregoing and any other rights of the Debtor in the foregoing.[36]

28.     Thus, this chapter 11 case is, at bottom, little more than a two-party dispute between the Debtor and its secured lender.  This dispute was on the verge of being resolved in its proper forum, the New Mexico state court, before the Debtor's bankruptcy filing on April 5.

## C.     The Debtor has No Operating Income

29.     The Debtor lacks any meaningful source of income, having admitted both in this Court and the New Mexico litigation that its liquid assets are *de minimis* and that its income in 2009 was "insignificant" (less than $50,000) and is expected to *decline* in 2010.[37]  The Debtor's 13-week budget submitted to this Court, as an exhibit to its first-day declaration, shows a "Total Receipts" line that is *blank* for the entire period.[38]  In other words, the Debtor has *no business revenues*.

---

[36]   Mortgage, §§ 1.1-1.2.  *See also* the Assignment of Rents, Assignment of Project Documents, and other personal property pledges described in the New Mexico Foreclosure Complaint, ¶¶ 23-44.

[37]   Cook State Court Affidavit, ¶ 14.

[38]   Cook Declaration, Exhibit A ("Westland DevCo LP Post-Petition Budget").

30.     The Debtor is effectively administratively insolvent.  It essentially admits this fact, as the only apparent source of funding for the Debtor's post-petition operations is the alleged willingness of one of its limited partners, D. E. Shaw Real Estate Portfolios 1, L.L.C. ("DESCO") – albeit uncommitted and entirely discretionary – to make certain limited equity contributions to fund expenses.[39]  Although the Debtor's first-day declaration states that DESCO's contribution is "reflected in the budget,"[40] DESCO's name appears nowhere on the attached budget and the reader is left to surmise that DESCO's equity contribution is subsumed in the "Borrower Project Funding" line.

31.     The Debtor's proffered budget is revealing: notwithstanding the Debtor's soaring rhetoric of development plans for "a new town within the City of Albuquerque," the Debtor appears to have no money and no plans to conduct any *development* operations at all.  Instead, the Debtor's post-petition budget devotes over half of its expenses to staff and administrative overhead ($1,101,606, or 46%) and bankruptcy-related expenses ($110,000, or 5%).[41]  The balance ($1,169,284, or 49%) is titled "Land Preservation Expenses," with no indication that any of them are going to actual construction or other development activity.  The Debtor is apparently proposing to do the minimum to keep the Real Property in a state of suspended animation while it drags out its litigation with Barclays.   And it goes without saying that the Debtor's budget does not include any amounts for post-petition adequate protection payments to Barclays.

---

[39]   Cook Declaration, ¶ 22.

[40]   *Id.*

[41]   The Debtor disclosed that its proposed bankruptcy professionals have already received retainers of over $1.6 million prior to the Petition Date.  *See* retention applications for Cole, Schotz, Meisel, Forman & Leonard, P.A. (Docket No. 9), ¶ 12 (retainer of $750,000); Katten Muchin Rosenman LLP (Docket No. 10), ¶ 19 (retainer of $150,000); and Navigant Capital Advisors, LLC (Docket No. 16) ¶ 18 (retainer of $750,825).  It is unclear whether these payments came from Barclays' cash collateral.

**D.** **The Debtor Is Damaging the Value of Barclays' Collateral**

32.     While this dispute remains unresolved, leaving the Debtor in control of the Real Property risks further damage to Barclays' collateral. The Debtor suggests that it is taking steps to develop the Real Property, but its recent acts and omissions – and its demonstrated lack of funds to pay for development activities – show that the Debtor's mismanagement threatens to further harm the value of the Real Property.

33.     The most basic evidence of the Debtor's failure is its inability to develop the Real Property. As noted above, the Barclays loan was intended as a bridge loan with a short maturity, when the Debtor would then refinance the loan in order to continue its development activities. None of this ever materialized, other than the original Barclays "bridge" loan. The Debtor failed to obtain a refinancing. It failed to obtain New Mexico legislative approval for as much as $408 million in infrastructure financing through the TIDDs.[42] It appears to have ceased its construction and development activities altogether. Since it acquired the Real Property over three years ago, consisting of approximately 57,000 acres, the Debtor has developed and sold approximately 2,000 acres. Of the remaining approximately 55,000 acres, the Debtor has developed less than 50 acres (334 lots) and the remaining 54,429.97 acres remain vacant.[43] Notwithstanding the Debtor's ambitious plans, this real estate project has failed.

34.     More recent, specific instances of the Debtor's mismanagement are described above and in Barclays' New Mexico state court pleadings: (1) The Debtor has failed to construct infrastructure improvements in a subdivision that its predecessor-in-interest, Westland Development, committed to the City of Albuquerque over a decade ago (in 1996), prompting the City to extend the original completion deadline (May 31, 1998) six times, most recently to May

---

[42]    *See supra* ¶ Paragraph 10 and accompanying notes.

[43]    *See supra* ¶ Paragraph 9 and accompanying notes.

10, 2010;[44] (2) the Debtor has jeopardized a significant proposed tract purchase by APS (discussed below); and (3) the Debtor's longtime local manager, Will Steadman, announced that he was resigning from managing the Real Property effective April 5, 2010.[45]

35.     The APS project is a recent example of the Debtor's inability to follow through on its long-standing infrastructure commitments.   APS and the Debtor's predecessor, Westland Development, entered into an option agreement in 2003, under which APS held an option to purchase a 75-acre tract that it intended to use for a school.[46]  The option agreement obligated the Debtor to pay for its "pro rata share" of infrastructure costs related to the proposed tract purchase, with such costs to be determined by a later engineering estimate and allocated between the Debtor and APS.[47]

36.     The Debtor later informed Barclays that APS was also interested in purchasing an additional 25 acres for a sports stadium, increasing the proposed tract purchase to 100 acres.[48] Barclays then tried for several months, without success, to get an accurate estimate from the Debtor of what its share of the infrastructure costs for both the 75-acre and 100-acre tracts would be – and how the Debtor intended to pay for them given its current financial condition – but has not received any such information from the Debtor.[49]

37.     Barclays then discovered from recent press reports that a capital outlay committee of APS recently voted to seek an alternative site for the proposed stadium – a fact that has been

---

[44]   *See* Subdivision Improvements Agreement.

[45]   *See supra* ¶ Paragraph 11 and accompanying notes.

[46]   Option Agreement, dated September 2, 2003, between APS and Westland Development, the Debtor's predecessor-in-interest (the "APS Option Agreement"), a copy of which, including amendments, was provided to Barclays and is annexed to the Wuest Declaration as Exhibit Q;

[47]   APS Option Agreement, § 4(d).

[48]   Wuest Declaration, ¶¶ 54-55.  *See also* "APS to Move Forward on SW Stadium," ABQ Journal, March 18, 2010, a copy of which is annexed to the Motion to Dismiss as Exhibit 15.

[49]   Wuest Declaration, ¶ 56.

confirmed by a review of that committee's publicly available minutes. The minutes reveal, moreover, that APS considered the Debtor to be "stalling" on the tract purchase.[50] Barclays then tried to arrange a meeting with both the Debtor and APS to get further information on the proposed purchase and specifically on the Debtor's potential infrastructure obligations. In response, the Debtor informed Barclays that such a meeting was not necessary and declined to arrange it.[51]

38.     The tale of the APS transaction demonstrates Barclays' predicament: Any potential opportunities for developing the Real Property go to waste because of the Debtor's unwillingness or financial inability to pursue them. The Debtor is now the obstacle to realizing any remaining value of the Real Property, and is frankly abusing the bankruptcy process in a desperate attempt to retain control.

## IV.     *RELIEF REQUESTED*

39.     If the Court is not inclined to dismiss this case, as requested in Barclays' Motion to Dismiss, Barclays respectfully submits that the Court should modify the automatic stay under pursuant to 11 U.S.C. § 362(d) to the extent necessary to permit Barclays to enforce its state law remedies under the Amended Loan Agreement, in light of: (i) the Debtor's bad faith filing; (ii) the Debtor's economic inability to provide adequate protection to Barclays' interest in the Real Property and related personal property; and (iii) the Debtor's complete lack of any equity in the Real Property and related personal property coupled with the absence of any meaningful prospect for reorganization.

---

[50]     *See* APS Minutes dated February 16, 2010 and March 2, 2010, copies of which are annexed to the Receiver Reply Brief as Exhibits "A" and "B" thereto.

[51]     Wuest Declaration, ¶ 57.

40.     At a minimum, to the extent the Court declines to lift the automatic stay for cause at this time, Barclays asks the Court, pursuant to 11 U.S.C. § 363(e), to condition the continuance of the stay on the Debtor providing adequate protection of Barclays' interest in the Real Property and related personal property, in the form of monthly cash interest payments under the Amended Loan Agreement.

41.     Lastly, Barclays requests that the Court designate the Debtor's chapter 11 case as a "single-asset real estate" (SARE) case under Bankruptcy Code § 362(d)(3), thereby requiring the Debtor to either file a confirmable plan of reorganization or begin making monthly adequate protection payments to Barclays no later than the earlier of (i) ninety days after the Petition Date or (ii) thirty days following the Court's ruling on this Motion.

A.      **Cause Exists to Modify the Automatic Stay**

42.     Section 362(d) of the Bankruptcy Code provides that the Court "shall grant relief from the stay . . . for cause, including the lack of adequate protection of an interest in property of such party in interest."  11 U.S.C. § 362(d)(1).

43.     At least two forms of "cause" to lift the stay are present in this case.

44.     First, as set out in more detail above, the Debtor filed this chapter 11 case in bad faith, solely as a litigation tactic to postpone Barclays' foreclosure on the Real Property.  The Debtor is not engaged in a good-faith attempt to reorganize, and lacks the fundamental economic ability to do so in any event.

45.     Second, further cause to lift the automatic stay exists because the Debtor is unable to provide adequate protection to Barclays' interest in the Debtor's assets.

46.     Barclays is undersecured and holds collateral (the Real Property and related personal property) that is likely to decline in value given the Debtor's financial and operational incapacity.  Moreover, by its own admission, the Debtor has no unencumbered assets, income or

other sources of free cash available to make adequate protection payments to Barclays to protect against the likely diminution in the value of Barclays' collateral if this chapter 11 case continues.

### (1) Bad Faith Filing of Petition

47. A debtor's lack of good faith in filing a bankruptcy petition constitutes cause for lifting the automatic stay. *In re Reitnauer*, 152 F.3d 341, 344 (5th Cir. 1998); *Little Creek Dev. Co. v. Commonwealth Mortgage Corp.,* 779 F.2d 1068, 1071 (5th Cir. 1986); *In re Dunes Casino Hotel*, 63 B.R. 939, 944 (D.N.J. 1986); *Sterling Bank & Trust v. Merchant* (*In re Merchant*), 256 B.R. 572, 577 (Bankr. W.D. Pa. 2000). As in the dismissal context, when a secured party seeks stay relief by challenging the good faith of a debtor's bankruptcy filing, the "burden of proving good faith is on the debtor." *In re Dunes Casino Hotel*, 63 B.R. at 944.

48. Courts gauge the good faith of a filing for the purposes of a stay relief motion by applying the same analysis they would apply to a dismissal motion. *In re Walden Ridge Dev., LLC*, 292 B.R. 58, 61-64 (Bankr. D.N.J. 2003) (analyzing in depth the good faith of the debtor's bankruptcy filing for purposes of both a dismissal motion and stay relief).

49. The Debtor, by its own admission, has no income, no foreseeable prospects for a successful reorganization, and no meaningful assets to preserve for the benefit of creditors.

50. The Debtor's sole material asset, the Real Property, is fully encumbered by Barclays' liens. To the extent the Debtor has any other material assets, they are also subject to Barclays' mortgage, which covers all personal property related to the Real Property and all proceeds. The Debtor has no other assets with which to make a distribution to creditors. With the Debtor financially (and practically) dead in the water, it is difficult to discern what value it is supposedly seeking to preserve by filing for bankruptcy – other than the "value" of delay and continued litigation before this Court.

51.     The Debtor's first-day declaration continues to speak of grandiose plans for developing the Real Property, but the Bankruptcy Code requires more than speculative hope to support a finding of a good faith filing.  Barclays' rights as a secured creditor cannot and should not be held in abeyance indefinitely while the Debtor pursues some visionary development scheme that has utterly failed under the Debtor's management for the past three years.  *Little Creek Development Co. v. Commonwealth Mortgage Corp. (In re Little Creek Development Co.)*, 779 F.2d 1068, 1073 (5th Cir. 1986) ("Resort to the protection of the bankruptcy laws is not proper under these circumstances because there is no going concern to preserve, there are no employees to protect, and there is no hope of rehabilitation, except according to the debtor's 'terminal euphoria.'").

52.     The Debtor's rhetoric aside, the real reason it filed this case is obvious from its timing: to obtain an unwarranted tactical litigation advantage, specifically, deferral of the New Mexico state court's consideration of Barclays' motions for summary judgment and motion for the appointment of a receiver, both of which were scheduled to be heard 45 minutes after the Debtor filed this chapter 11 case.  In all but name, this case presents a classic two-party dispute between the Debtor and its secured lender, which holds a lien on all of its material assets.  The Debtor asserted no plausible defenses in the New Mexico foreclosure suit, and in fact admitted in its pleadings that all loan and security documents were valid, that the Loan matured on July 9, 2009, and that the Debtor failed to repay it.  Faced with the prospect of imminent summary judgment and the appointment of a receiver in the New Mexico state court, the Debtor grasped for its last-ditch hope to delay the loss of its assets, a chapter 11 filing.

53.     Accordingly, for all of the reasons set forth above, the Court should grant relief from the automatic stay to permit Barclays to exercise its remedies with respect to the Real Property and other collateral.

(2)     <strong><u>The Debtor Cannot Provide Adequate Protection to Barclays' Interest in the Debtor's Assets</u></strong>

54.     Barclays holds perfected, first priority liens against the only material asset of the Debtor's estate, the Real Property.  To the extent the Debtor has any other material assets, they are also subject to Barclays' perfected, first priority liens.

55.     The Debtor lacks any meaningful source of income, having admitted both in this Court and the New Mexico litigation that its liquid assets are *de minimis* and that its income in 2009 was less than $50,000 and is expected to decline in 2010.  The Debtor's 13-week budget submitted to this Court shows no business revenues, and its sole source of apparent support to pay ongoing expenses appears to be a discretionary equity contribution by one of its limited partners, DESCO.  As shown above, the Debtor's budget devotes over half of its expenses to staff, administrative overhead, and bankruptcy expenses, and the balance to "Land Preservation Expenses" with apparently no resources devoted to any construction or development activity.

56.     The Debtor's budget does not appear to include *any* amounts for post-petition adequate protection payments to Barclays.  This is not surprising:  Since the Debtor has no business operations, no cash flow, no equity cushion in any of its assets, and no lien-free assets to offer as additional collateral for Barclays' claims, it is clear that the Debtor cannot possibly provide any adequate protection of Barclays' interest in the Real Property and related personal property.

57.     Moreover, not only is the Debtor unable to provide adequate protection to Barclays, but its acts and omissions have demonstrated that the Debtor continues to *diminish* the

value of Barclays' collateral. As shown above (Part III.D hereof), the Debtor has neglected the development of the Real Property for more than three years, primarily through its failure to obtain refinancing, its inability to fund infrastructure improvements, its squandering of promising development opportunities (e.g., the endangered APS school and stadium purchase), and its loss of key management (e.g., Will Steadman's recent resignation).

58.     Notwithstanding the Debtor's suggestion to this Court at the April 13 status hearing that it has very good governmental relationships that will enable it to finish this project,[52] the history of this project proves the opposite. The Debtor twice failed to obtain approval from the New Mexico legislature in 2008 and 2009 for the TIDD bonds, a critical source of infrastructure financing.[53] The local public school authority (APS) has publicly described the Debtor as "stalling" on its proposed school and stadium purchase, and begun to look elsewhere for a site.[54] And the City of Albuquerque has filed various liens on the Real Property, which unfortunately compelled Barclays to join the City as a defendant in the New Mexico foreclosure suit.[55] Two of the liens are for "delinquent water and/or sewer and/or refuse charges" (filed in September 2008 and April 2009), and a third is for "the cost of cutting and removal of Weeds and Debris" (filed in September 2009). The City's filed answer to the foreclosure suit states that these liens are still outstanding.[56] A fourth lien was filed by the City to cover the Debtor's obligation to complete certain drainage improvements, in effect since 1996 with an original completion

---

[52]   *See* April 13 Hearing Transcript, at 4 (Debtor's counsel stating that the Debtor and its equity participants have "built and forged very material relationships, as Your Honor can imagine, with all of the governmental agencies and individuals that's necessary to take a project like this and bring it full term").

[53]   *See supra* ¶ 10 and accompanying notes.

[54]   *See supra* ¶¶ 10, 35-38 and accompanying notes.

[55]   *See* State Court Complaint, ¶ 46.

[56]   *See* the City of Albuquerque's Answer filed on February 10, 2010 in response to Barclays' State Court Complaint (the "City of Albuquerque Answer"), a copy of which is annexed hereto as Exhibit 17, at Exhibit A ($235.86 lien, recorded Sept. 23, 2009), Exhibit B ($1,152.25 lien, recorded April 6, 2009), and Exhibit C ($1,056.41 lien, recorded Sept. 8, 2008).

deadline of May 31, 1998. The City has since extended the Debtor's deadline six times, with the current deadline expiring on May 10, 2010 and possibly triggering the imposition of a $1.7 million lien on the Real Property.[57]

59. Barclays also notes that the Debtor has disclosed that its proposed bankruptcy professionals received retainers of over $1.6 million prior to the Petition Date.[58] Barclays demands a response from the Debtor as to whether these retention payments came from Barclays' cash collateral. The Navigant application states that the Debtor paid its pre-petition retainer ($750,825), while the Cole Schotz and Katten Muchin applications state only that these professionals "received" their pre-petition retainers (totaling $900,000) without indicating the source of payment.[59] If the Debtor is shown to have used Barclays' cash collateral without its consent for the payment of these extremely high retainers – particularly given the Debtor's current financial state (e.g., less than $4,000 in cash) and Barclays' severely undersecured position – then this is further evidence of the Debtor's ongoing, active damage to Barclays' collateral position. *See In re River Oaks Limited Partnership*, 166 B.R. 94, 97-100 (E.D.Mich. 1994)(debtor could not use the mortgage lender's cash collateral to pay "administrative type" expenses, such as expert witness fees, without the lender's consent, since such expenses were not necessary to "preserving" the debtor's real property within the meaning of Section 506(c) of the Bankruptcy Code; only if the debtor provided adequate protection to the mortgage lender under Section 363 could it use the

---

[57]  *See supra* note 15 and accompanying text. *See also* the City of Albuquerque Answer, at Exhibit D thereto (City's protective lien with respect to the Subdivision Improvements Agreement).

[58]  *See* the retention applications described in footnote 40 hereof, of Cole, Schotz, Meisel, Forman & Leonard, P.A. ( "Cole Schotz"), at ¶ 12 (retainer of $750,000); Katten Muchin Rosenman LLP ( "Katten Muchin"), at ¶ 19 (retainer of $150,000); and Navigant Capital Advisors, LLC ("Navigant"), at ¶ 18 (retainer of $750,825).

[59]  *Id.*

lender's cash collateral for expenses "not directly related to the operation and maintenance" of the real property, such as administrative expenses).

60.    Nevertheless, if the Court were to decide to continue the automatic stay for a limited period of time, as a condition to that benefit the Court should require the Debtor to begin making monthly adequate protection payments to Barclays in an amount not less than $1,469,020.50 ($48,967.35 per diem), representing the current default interest that would otherwise accrue under the Amended Loan Agreement.[60]

61.    The Court should further provide that, if the Debtor fails to make any such payment when due, the automatic stay will terminate automatically with respect to the Real Property and other collateral without the necessity for a further order of the Court.

**B.    The Debtor Has No Equity in Its Assets and No Prospects for Reorganization**

62.    Section 362(d)(2) of the Bankruptcy Code provides an independent and alternative basis for modifying the stay because the Debtor has no equity in the Real Property and its other assets and no ability to confirm a plan in this case.

63.    Section 362(d)(2) of the Bankruptcy Code provides that a court "shall grant relief from the stay:

> With respect to a stay of an act against property … if—
> (A) the debtor does not have an equity in such property; and
> (B) such property is not necessary to an effective reorganization.

11 U.S.C. § 362(d)(2).

---

[60]  This is the current rate of default interest under the Amended Loan Agreement assuming no changes in LIBOR, which is used to determine the interest rate.  Wuest Declaration, ¶ 45.  If LIBOR changes, the default rate of interest will change.

### (1)    The Debtor Lacks Equity in the Real Property

64.    The Debtor's lack of equity in the Real Property and other collateral is not subject to reasonable dispute.

65.    As discussed above, none of the three independent appraisers that have recently valued the Real Property have concluded that its value approaches anywhere near even the minimum claim that the Debtor admits it owes Barclays ($181,775,168.03 in principal only), let alone the full amount that is actually owed as of the Petition Date after taking account of accrued interest, late fees, and other charges ($194,258,208.67, plus attorneys' fees and collection costs). The three appraisals ranged from $95,000,000 to $148,100,000, leaving Barclays an unsecured deficiency claim of at least $33,675,168.03 to $86,775,168.03 (using the Debtor's admitted principal-only claim amount), and more likely ranging from $46,158,208.67 to $99,258,208.67 (using Barclays' full claim amount).

66.    It is beyond peradventure that the Debtor has no equity in the Real Property. The automatic stay should be modified to the extent necessary to permit Barclays to exercise its remedies with respect to the Real Property and other collateral.

### (2)    The Debtor Lacks the Ability to Confirm a Plan

67.    It is well established that, where there is no realistic prospect of a plan being confirmed in a reasonable amount of time, no "effective reorganization" is possible, and a secured creditor's collateral is therefore not "necessary to an effective reorganization." *United Savings Ass'n v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 376 (1988) (debtor has the burden "to establish that the collateral [of an undersecured creditor] is 'necessary to an effective reorganization'" meaning "not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it, but that … there must be a reasonable

possibility of a successful reorganization within a reasonable time."); *Nantucket Investors II v. Cal. Fed'l Bank* (*In re Indian Palms Assoc., Ltd., B.C.*), 61 F.3d 197, 209 (3rd Cir. 1995).

68.     In this case, the Debtor is merely extending its litigation strategy by claiming to be looking "to explore all possible alternatives for restructuring the Loan in a challenging real estate market."[61]

69.     The potential utility of the Real Property for speculative restructuring proposals that may – or may not – be fabricated at some as-yet unspecified point in the future is not a sufficient basis for continuation of the automatic stay.

## C.     The Court Should Designate This Case as a Single Asset Real Estate Case

70.     Under Bankruptcy Code § 362(d)(3), the Court must grant relief from the automatic stay

> with respect to a stay of an act against single asset real estate … by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the [Petition Date] (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later – (A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or (B) the debtor has commenced monthly payments that … are in an amount equal to the interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate[.]

11 U.S.C. § 362(d)(3). "Single asset real estate" is, in turn, defined by the Bankruptcy Code to mean:

> real property constituting a single property or project, other than residential real property with fewer than 4 residential units, which generates substantially all of the gross income of a debtor who is not a family farmer and on which no substantial business is being conducted by a debtor other than the business of operating the real

---

[61] Cook Declaration, ¶ 21.

26

> property and activities incidental.

11 U.S.C. § 101(51B).

71.     The Real Property qualifies as "single asset real estate" ("<u>SARE</u>").  The Debtor acquired the Real Property in 2006 as part of a single development project, defined as the "Project" in the loan documents and in the Debtor's bankruptcy papers.  The Debtor has always envisioned – and continues to envision, as shown in its first-day declaration – the "Project" as its sole business.  The original loan documents and the Debtor's organizational documents reflected this orientation of the Debtor's business: it is structured as a single-purpose entity (SPE) the sole business of which is development of the Real Property.  For the minimal portion of the Real Property that the Debtor has actually developed since 2006, approximately 2,000 acres out of 57,000 acres originally acquired and pledged to Barclays, the Debtor has sold off those lots to third parties and attempted (and failed) to develop and sell the remaining 55,000 acres.

72.     Although the Debtor claims that the "Project" involves three distinct separate parcels of land, its operation as a single development project clearly qualifies it for SARE treatment under the Bankruptcy Code.  *See In re Philmont Dev. Co.*, 181 B.R. 220, 224-25 (Bankr. E.D. Pa. 1995) (holding that the definition of "single asset real estate" applied to a limited partnership that owned and operated multiple properties as a single project); *see also In re Triumph Inv. Group, Inc.*, 2009 WL 2916986, *2 (Bankr. E.D. Pa. 2009) (noting that the "purpose of section 362(d)(3) is to address perceived abuses in single asset real estate cases, in which debtors have attempted to delay mortgage foreclosures even when there is little chance that they can reorganize successfully" and holding this section to apply to the bankruptcy of a real estate developer who filed on the eve of foreclosure); *In re Vargas Realty Enterprises*, 2009 WL 2929258 (Bankr. S.D.N.Y.) ("even if the all of the debtors and properties were viewed as a single

entity…the definition of 'single asset real estate' is not limited to a single piece of real estate; it includes multiple pieces of real estate operated as a single project by the debtor"); *In re Kara Homes, Inc.*, 363 B.R. 399 (Bankr. D.N.J. 2007) (holding that real estate developers who acquire land, design residences appropriate for construction at given sites, and market and sell residences to generate income are SARE); *In re Land Preserve, LLC*, 2007 WL 1964064, *3-*4 (Bankr. D. Conn. 2007) (applying the SARE provisions to the bankruptcy of a real estate developer who tried "to develop housing on the property" for "years prior to its petition" without success); *In re Pensignorkay, Inc.*, 204 B.R. 676, 681-82 (Bankr. E.D. Pa. 1997) (holding that a real estate developer qualified as SARE, despite its total lack of income, because "Congress did not intend to excuse from compliance with the revised statute the class of debtors who hold undeveloped tracts of land for future development").

73.     While the Real Property may involve the development of residential homes, it obviously does not consist of "residential real property with fewer than 4 residential units."  *See* 11 U.S.C. § 101(51B) (emphasis added).  As discussed above, the Real Property now consists of 334 developed lots (48.87 acres) and over 54,429.97 acres of vacant land.

74.     Finally, the Real Property represents the Debtor's only source of income, although that income is *de minimis* by the Debtor's own admission – less than $50,000 in 2009 and expected to decline in 2010.  And, as noted above, the Debtor's 13-week budget filed with its first-day declaration shows *no* operating income during that period.

75.     Accordingly, in the event the Court determines to delay dismissal of this chapter 11 case, it should designate this case as a single asset real estate case pursuant to section 362(d)(3) of the Bankruptcy Code, and require the Debtor to file a plan of reorganization "that has a reasonable possibility of being confirmed within a reasonable time," or begin making monthly

contractual interest payments of $1,131,406.20 ($37,713.54 per diem) to Barclays, representing the current non-default interest that would otherwise accrue under the Amended Loan Agreement,[62] in either case no later than the earlier of (i) ninety days after the Petition Date or (ii) thirty days after the Court's decision on this Motion.

---

[62]   This is the current rate of non-default interest under the Amended Loan Agreement assuming no changes in LIBOR, which is used to determine the interest rate.  Wuest Declaration, ¶ 46.  If LIBOR changes, the non-default rate of interest will change.

## V.    CONCLUSION

WHEREFORE, Barclays respectfully requests entry of an Order granting the relief requested herein, together with such other and further relief as this Court deems just and proper.

DATE: April 15, 2010                          Respectfully submitted,


 /s/ Kevin J. Mangan
Francis A. Monaco, Jr. (No. 2078)
Kevin J. Mangan (No. 3810)
**WOMBLE CARLYLE SANDRIDGE & RICE, PLLC**
222 Delaware Avenue
Wilmington, Delaware 19801
(302) 252-4320
Telecopy: (302) 252-4330


Richard S. Miller
Jeffrey Rich
Eric Moser
**K&L GATES LLP**
599 Lexington Avenue
New York, NY 10022
(212) 536-3900
Telecopy: (212) 536-3901

**ATTORNEYS FOR
BARCLAYS CAPITAL REAL ESTATE INC.**