## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| Westland DevCo, LP,[1] | : | Case No. 10-11166 (CSS) |
| | : | |
| Debtor. | : | **Hearing Date: May 5, 2010 at 9:30 a.m. (ET)** |
| | : | **Objection Deadline: April 28, at 4:00 p.m. (ET)** |
| | : | **Related Docket No. 23** |

## DEBTOR'S OBJECTION TO THE MOTION OF BARCLAYS CAPITAL REAL ESTATE, INC. TO DISMISS THE DEBTOR'S CHAPTER 11 CASE PURSUANT TO SECTION 1112(b) OF THE BANKRUPTCY CODE

Westland DevCo, LP (the "Debtor") hereby objects (the "Objection to the Dismissal Motion") to the Motion of Barclays Capital Real Estate, Inc. ("Barclays") to Dismiss the Debtor's Chapter 11 Case Pursuant to Section 1112(b) of The Bankruptcy Code (the "Dismissal Motion") [Docket No. 23]. In support of the Objection, the Debtor relies upon and fully incorporates by reference the Declaration of Bruce V. Cook in Support of Debtor's Chapter 11 Petitions (the "First Day Declaration") [Docket No. 3], the Declaration of Bruce V. Cook in Support of (A) the Debtor's Objection to the Motion of Barclays Capital Real Estate, Inc. ("Barclays") to Dismiss the Debtor's Chapter 11 Case Pursuant to Section 1112(b) of the Bankruptcy Code and (B) the Debtor's Objection to the Motion of Barclays for Entry of an Order: (a) Granting Relief from the Automatic Stay, (b) Conditioning any Continuation of the Stay on the Provision of Adequate Protection; and (c) Confirming that this is a Single Asset Real Estate Case Subject to 11 U.S.C. § 362(d)(3) (the "Cook Declaration"), the Declaration of Frank Faye in Support of (A) the Debtor's Objection to the Motion of Barclays Capital Real Estate, Inc. to Dismiss the Debtor's Chapter 11 Case Pursuant to Section 1112(b) of the Bankruptcy Code

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number is: Westland DevCo, LP (6647).

and (B) the Debtor's Objection to the Motion of Barclays for Entry of an Order: (a) Granting Relief from the Automatic Stay, (b) Conditioning any Continuation of the Stay on the Provision of Adequate Protection; and (c) Confirming that this is a Single Asset Real Estate Case Subject to 11 U.S.C. § 362(d)(3) (the "Faye Declaration") and the Declaration of Robert Starkman in Support of (A) the Debtor's Objection to the Motion of Barclays Capital Real Estate, Inc. to Dismiss the Debtor's Chapter 11 Case Pursuant to Section 1112(b) of the Bankruptcy Code and (B) the Debtor's Objection to the Motion of Barclays for Entry of an Order: (a) Granting Relief from the Automatic Stay, (b) Conditioning any Continuation of the Stay on the Provision of Adequate Protection; and (c) Confirming that this is a Single Asset Real Estate Case Subject to 11 U.S.C. § 362(d)(3) (the "Starkman Declaration" and, together with the First Day Declaration, the Cooke Declaration and the Faye Declaration, the "Declarations", filed contemporaneously herewith (with the exception of the First Day Declaration)).[2] In further support of the Objection, the Debtor respectfully states as follows:

## PRELIMINARY STATEMENT

1.     In filing for bankruptcy protection, the Debtor sought to protect and preserve the value of its business as a going concern and assets for the benefit of all stakeholders and to explore all possible alternatives for restructuring its indebtedness for the benefit of all constituent stakeholders, including its lenders, Barclays, Five Mile Capital SPE B LLC ("Five Mile") and iStar Bank ("iStar" and, together with Barclays and Five Mile, collectively, the "Lenders"). Indeed, the Debtor intends to file a plan of reorganization within ninety days of the Petition Date

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the First Day Declaration, Cook Declaration, Faye Declaration and Starkman Declaration, as applicable.

2

that will allow for the restructuring of its indebtedness in accordance with the requirements of the Bankruptcy Code.

2.     The Debtor made a sound business decision to file for Chapter 11 protection to preserve the value of its business as a going concern and assets for the benefit of all stakeholders only after months of deliberations and attempts to avoid a bankruptcy through an out-of-court consensual restructuring with the Lenders failed.  The Debtor's decision to file was made in good faith for valid business purposes and not simply to gain a litigation advantage in the State Court Litigation as evidenced by the fact that the Debtor was authorized to file for Chapter 11 relief on December 23, 2009, months prior to the Petition Date.  The filing occurred immediately before the State Court Hearing to consider, among other things, the Lenders' request for the appointment of a receiver.  The appointment of a receiver would have jeopardized the business as it would have displaced management thereby negatively impacting the business as such an appointment could impact the numerous permits and other regulatory approvals that the Debtor worked to obtain to further the Project.  Indeed, the goals of the Debtor in filing its petition epitomize one of the fundamental purposes of the Bankruptcy Code: to provide a debtor a breathing spell from its creditors and the necessary time and opportunity to formulate a plan of reorganization.

3.     Against this backdrop, the Dismissal Motion is meritless.  The extraordinary relief sought by Barclays is reserved for extreme circumstances that are not present here.  Moreover, Barclays ignores that a plain reading of section 1112 of the Bankruptcy Code, as amended in 2005, mandates that the movant establish "cause" for dismissal, and that if the "cause" at issue is the debtor's bad faith, then the movant must affirmatively establish such bad faith.  As set forth below, despite its lengthy recitation of "facts", numerous statements "upon information and

3

belief" and submission of thousands of pages in exhibits, Barclays fails to introduce <u>any</u>

competent evidence of the Debtor's bad faith.  Instead, Barclays chooses to rely on conclusory

statements, mere speculation, conjecture, and even blatant misrepresentations.  Barclays'

allegations of mismanagement are totally off base.  In fact, the Lenders' own conduct and/or

inaction has frustrated the Debtor's efforts to further the development of the Project and uses for

the Real Property.  Barclays utterly fails to meet its statutory mandate to establish cause for

dismissal and, therefore, the Dismissal Motion should be denied.

## <u>STATUS OF THE CASE AND JURISDICTION</u>

4.       On April 5, 2010 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for

relief under chapter 11 of the Bankruptcy Code (the "<u>Chapter 11 Case</u>").  Since the Petition Date,

the Debtor has remained in possession of its assets and continued to operate its business as a

debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

5.       An official committee of unsecured creditors (the "<u>Committee</u>") was appointed on

April 20, 2010.  No trustee or examiner has been appointed in this Chapter 11 Case.

6.       The Debtor owns and is developing approximately 55,000 acres of property

located within and near the City of Albuquerque, County of Bernalillo, New Mexico (the

"<u>Project</u>").  D.E. Shaw Real Estate Portfolios 1, L.L.C. ("<u>DESCO</u>") is committed to fund all

administrative claims incurred by the Debtor within the first thirteen weeks of the case in

accordance with the budget submitted with the First Day Declaration.

7.       On April 13, 2010, the Court held a status hearing (the "<u>Initial Status Hearing</u>").

At the Status Hearing, the Court scheduled the Dismissal Motion to be heard on May 5, 2010 at

9:30 a.m. (Eastern Time).  In addition, Barclays advised the Court of its intention to file a motion

4

for relief from the automatic stay, and the Court scheduled such motion to be heard at the same time as the Dismissal Motion, provided Barclays filed its stay relief motion by April 16, 2010.

8.      On April 15, 2010, Barclays filed the Motion of Barclays Capital Real Estate Inc. for Entry of an Order: (A) Granting Relief from the Automatic Stay, (B) Conditioning any Continuation of the Stay on the Provision of Adequate Protection; and (C) Confirming That This is a Single Asset Real Estate Case Subject to 11 U.S.C. § 362(d)(3) (the "Lift Stay Motion") [Docket No. 39]. Accordingly, the Lift Stay Motion will be heard in the event the Court denies the Dismissal Motion.

9.      On April 19, 2010, the Debtor filed its schedules of assets and liabilities (the "Schedules") [Docket No. 46] and statement of financial affairs (the "Statements" and, together with the Schedules, the "Schedules and Statements") [Docket No. 47]. The Schedules and Statements reflect total assets of $360,420,550.39 and total liabilities of $201,857,867.92. As set forth in Schedule D, the Debtor reflects secured debt in the total aggregate amount of $181,775,168.03 for the Loan (as defined below) that is allocated among the Lenders plus two additional creditors that have filed liens against the Debtor with unknown secured claims. As set forth on Schedule F, there is $19,914,841.38 in unsecured debt owed to approximately 45 creditors, with an insider entity, D. E. Shaw Real Estate Holdings 1(C), LLC, listed as having a contingent $15 million claim on account of a recourse guaranty and an insider entity, SunCal Management, LLC, owed approximately $4 million on account of management fees.

10.     On April 26, 2010, the Court held a teleconference status hearing (the "Status Hearing") to discuss scheduling and discovery in connection with the Dismissal Motion and the Lift Stay Motion. The Court indicated, among other things, that all affidavits to be proffered as

direct testimony and any expert reports must be filed by April 29, 2010 and depositions must be completed by May 3, 2010.[3]

11.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper in this District and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## FACTUAL BACKGROUND[4]

### A.     Background and Scope of the Project

12.     The Debtor owns three parcels of land totaling approximately 55,000 acres located within and near the City of Albuquerque, County of Bernalillo, New Mexico: the Petroglyphs, Zacate and significant undeveloped land holdings (collectively, the "Real Property") which are in various states of development and planned development.  The Real Property, a single piece of land twice the size of Boston, was originally owned by settlors to the area over three hundred years ago who were granted what was named the "Atrisco Land Grant" by the King of Spain in 1692.  The Real Property was owned by the Westland Development Co., Inc. ("Westland"), whose shareholders were the heirs to those settlors prior to the completion of a merger whereby the Debtor ended up with ownership of the Real Property.  The Project is enormous and unprecedented.  As conceived, the Project essentially will create a new town within and/or adjacent to the City of Albuquerque that will include burgeoning commercial,

---

[3] After Barclays filed its Lift Stay Motion and Dismissal Motion containing no justification for the relief sought, Barclays served the Debtor will extensive, overbroad discovery requests, presumably in an attempt to supplement its proof at the evidentiary hearing on these motions that Barclays insisted be heard in an extremely short window of time.

[4] All the factual allegations contained in these section are supported by the First Day Declaration, Faye Declaration, Stark Declaration and Cook Declaration.

45895/0001-6442292v5

industrial and residential areas with new schools, parks and other amenities, such as an arts and cultural district, among others, and will preserve the Atrisco heritage.

13.     The Petroglyphs parcel consists of approximately 4,900 acres and is partially under construction with multiple residential subdivisions, utilities and roadway infrastructure. The unimproved portion of the Petroglyphs parcel is designated for future residential development.  As approved, Petroglyphs is intended to be sold as improved residential lots to local and regional homebuilders.  The Petroglyphs parcel has improved residential lots under contract and construction and a proposal for near-term development of residential lots with specified land use designations and contracted builder pricing.  Zacate, with approximately 13,600 acres, and the undeveloped land, with approximately 36,200 acres, are unimproved land parcels currently not approved or designated for near-term development.

14.     The Debtor plans to sell approximately 37,418 market-rate residential lots in the Project over the next 20 plus years, including 14,848 in the Petroglyphs sections and 22,570 in the Zacate section.  The Debtor expects to sell the remaining 36,000 acres off in bulk.  The Debtor also plans to sell approximately 1,005 acres of commercial land in the Petroglyphs and approximately 2,124 acres of commercial land in Zacate.

15.     The Debtor's minimal operating income is nothing unexpected.  It was never anticipated that the Project would generate any meaningful income in the short term.  Instead, the Project would generate substantial income only after a long period of time (i.e., approximately 20 years) during which the planned development would occur.  Because the Project was not projected to generate meaningful income short term, it was clear that there would not be sufficient income to pay off the Loan either during its original term of June 7, 2008 or during the short-term extension ending July 9, 2008 (or during the one-year extension thereafter), as

7

evidenced by the fact that none of the projections, even when the real estate market was active, showed any meaningful income in the short term.

**B.    Overview of the Debtor's Infrastructure Improvements and Financing for Same**

16.    The Debtor has made significant infrastructure improvements at the Real Property and has spent considerable time and incurred substantial costs in planning for the development of the Project.  In addition, the Debtor has taken steps to improve the Project and enhance its value through the Stadium Transaction (as defined below) and the Solar Farm Plat (as defined below) but was effectively blocked from effectuating those transactions by the Lenders as discussed more fully below.  Moreover, the Lenders interfered with the Debtor's ability to secure TIDD financing (as defined below) by filing the Foreclosure Complaint (as defined below) just before New Mexico's one month legislative session opened in January 2010.

17.    To date, the Debtor or its equity sponsors have invested approximately $183 million into the Project which investment has been used for, among other things, the acquisition of the Real Property, hard and soft costs for the maintenance, planning and development of the Project as described below, interest and principal payments to the lenders, and the funding of reserves held by the lenders for interest, property taxes and insurance.  The Loan (together with cash equity invested by the Debtor or its equity sponsors) was used to acquire the Real Property and fund interest, property taxes and insurance until the reserves was depleted, after which equity was contributed to maintain the reserves.  None of the Loan proceeds were used for improvements.

18.    The Debtor, through its financial partner, DESCO, has spent approximately $15 million on hard costs covering, among other things, (i) completing a community park which serves the Sundoro South subdivisions, which at build out will have around 700 residences; (ii)

8

completing the infrastructure for the area designated as Storm Cloud Phase I, including the construction of three district parks; (iii) entering into an agreement with the Albuquerque Metropolitan Arroyo Flood Control Authority (the "AMAFCA") and the State Department of Transportation (the "DOT") for the design and construction of storm drain trunk facilities utilizing the DOT's Interstate right of way; (iv) obtaining approval for the Watershed/Inspiration site plan from the City of Albuquerque's Environmental Planning Commission; (v) negotiating and obtaining approval of a development agreement for the Upper Petroglyphs from the Albuquerque Bernalillo County Water Utility Authority (something the Debtor achieved in approximately nine months, whereas its predecessor-in-interest could not achieve after years of trying); and (vi) developing a long range vision plan to determine the potential for urbanization within the Project over the next 25-30 years (the "Long Range Vision Plan").

19.     The Debtor, through its financial partner, has spent approximately $45 million to date on soft costs covering, among other things, property and liability insurance, construction management, general and administrative items, legal and closing costs, a master marketing program, political contributions and consultants, the interest rate hedge for the Loan, economic development and property taxes. Additionally, proceeds of the partner's investment were also used to close the Loan transaction, to make interest and principal payments on the Loan, and to establish reserves for property taxes and insurance.

20.     The Debtor has an upcoming deadline expiring on May 10, 2010 for a commitment to the City of Albuquerque to build drainage infrastructure in the Storm Cloud subdivision. There is nothing alarming about this deadline. The Debtor has taken the necessary steps to get approval of an extension of this commitment by applying for a two-year extension of the subdivision improvement agreement with the City of Albuquerque. (See Debtor's extension

9

application, attached as Exhibit 1 to the Starkman Declaration). The Debtor and its precedessor have routinely obtained two-year extensions since 1996 for the obligation to build the drainage infrastructure improvements in the Storm Cloud subdivision as this infrastructure only will be needed when the subdivision is built and not before. The extensions were routinely approved in the past and the Debtor has no reason to believe the latest extension application will not be granted. The failure to construct infrastructure improvements in the Storm Cloud subdivision is clearly not evidence of any mismanagement by the Debtor as asserted by Barclays in paragraph 32 of the Motion to Dismiss. In fact, the obligation was originally due to be completed in 1998, and was extended four times even before completion of the merger by which the Debtor ended up with title to the Real Property. Barclays makes reference in paragraph 58 of the Lift Stay Motion to the possible "imposition of a $1.7 million lien on the Real Property" in the event that the Debtor does not obtain an extension of the upcoming May 10, 2010 deadline. The "possible" lien that Barclays refers to is a lien that has been on the Real Property since 1996 and was put in place in lieu of posting a subdivision bond. Whether or not the Debtor obtains an extension for the upcoming May 10, 2010 deadline does not in any way impose a lien on the Real Property. Barclays admits that if the Debtor's extension is approved then that alleviates their concern about the failure to put infrastructure improvements in that subdivision. (See Deposition Transcript of Mark Wuest at 134:17-25).

21.     Barclays points to several liens filed by the City of Albuquerque as evidence that the Debtor does not have good governmental relationships. (See ¶ 58 of Lift Stay Motion). Barclays mentions the following liens that collectively total only $2,444.52: (i) a lien in the amount of $235.86 recorded on September 23, 2009 (the "September 2009 Lien"); (ii) a lien in the amount of $1,152.25 recorded on April 6, 2009 (the "April Lien"); (iii) a lien in the amount

of $1,056.41 recorded on September 8, 2008 (the "September 2008 Lien"). The April Lien was released and, therefore, is no longer outstanding. (See Lien release attached as Exhibit 2 to the Starkman Declaration). At no time during the Debtor's regular course of dealings with city officials, did any of them ever bring up these liens, which is not surprising since the amount of these liens is nominal. The existence of these liens has no impact on the Debtor's ability to continue to move forward with its plans for the Project.

22.    The Debtor's goal is to secure just under $1 billion in infrastructure financing for the Project over a period of approximately sixteen years through tax increment development districts ("TIDDs") that would issue public bonds secured by future gross receipt taxes and property tax revenues to reimburse the Debtor for infrastructure improvements. The purpose of a TIDD is to promote economic development and sustainable communities. Through extensive lobbying and other related efforts and initiatives, including widespread community outreach and contacts that the Debtor has developed since the completion of the merger, the Debtor is confident that it has the support for the approval of the TIDDs from the leadership of the legislative and executive branches of state government as well as the legislature and senior staff at the city and county levels.

23.    The Debtor has worked very hard and has come very close to obtaining legislative approval of the TIDDs that have been formed to date. In 2008, the state legislature was in session for only thirty days. The state house of representatives approved $609 million in bonds for five TIDD districts for the Project by a vote of 35-22; however, a filibuster in the state senate from politicians that were opposed to public financing generally resulted in the stalling and ultimate inability to receive the necessary votes to pass the legislation approving these bonds during that session. In 2009, the state senate approved $408 million in bonds to finance four

11

TIDD Districts by a wide margin (29 to 9). The bill overwhelmingly passed all the necessary committees and went to the floor of the state house of representatives at approximately midnight on the final night the legislature was in session. The initial vote was a tie (32 to 32) and a motion for reconsideration also tied 32-32 due to last minute confusion and lack of time to present thorough argument. As a result, the state house of representatives did not approve the legislation for the bonds at the 2009 session. Even thereafter, however, the Debtor engaged in discussions with legislators and other officials about its future TIDD efforts to ensure they knew the Debtor was fully committed to the effort going forward.

24. With the support of the Lenders, it is reasonably likely a TIDD bill would have passed in the 2010 legislative session. The Debtor understood that the leadership of the legislative and executive branches of state government supported approval of $408 million in bonds to finance four TIDD districts this year for the Project. The Lenders' filing of its foreclosure complaint in December of 2009 - shortly before the 2010 legislative session opened in early January - blocked the Debtor's ability to secure TIDD financing for 2010 given the uncertainty surrounding the Project caused by the Lenders' foreclosure complaint, thus resulting in the failure to obtain legislative approval of hundreds of millions of dollars for infrastructure development at the Project. The legislature did, in fact, approve TIDDs for a project known as Las Cruces, which shows that both chambers of the legislature were open to and would have likely approved TIDD financing for the Project.

## C. The Debtor's Key Relationships with State and Local Officials

25. Over time, the Debtor has developed and fostered key relationships with state, county, city, school district and water authority officials that are necessary to make this enormous and unprecedented Project a success. The support of these officials is evidenced, in

45895/0001-6442292v5

part, by the approval of (i) nine TIDDs by Bernalillo County, (ii) four of the nine TIDD Districts by the New Mexico Board of Finance and (iii) countless zoning, licensing and regulatory approvals obtained by the Debtor from the county and the City of Albuquerque for the various residential and commercial developments in the Project. The process for obtaining these types of governmental approvals involves numerous meetings and communications with city and county officials at all levels of government. The Debtor's efforts to develop and foster these key relationships involve keeping the officials informed about the Project developments, working with the officials to bridge relationships for further developments and at the same time complying with the various zoning, licensing and regulatory requirements necessary for a Project of this size. The Debtor has a good relationship with the City of Albuquerque, particularly the mayor, his staff and other officials in numerous departments and the Debtor speaks with high level city officials on a regular basis.

26.    Before the Petition Date, on March 17, 2010, William Steadman was terminated by Argent Management, LLC ("Argent"), the Debtor's management company. Although Mr. Steadman was viewed by the local community as the "manager" of the Project, he was not, in fact, in charge of the management of the Project. Rather his primary duties related to the TIDD effort and community outreach, although many other people at the local level, as well as the Debtor's partners, were involved in these efforts. Management of the Project was consolidated in Argent's corporate office after the resignation of Bill Myers in April 2008 who was, prior to his resignation, a company regional president with oversight responsibilities for New Mexico. Because Mr. Steadman did not have responsibility of overseeing the Project, his departure has not impacted, and the Debtor expects it will not impact the Debtor's key relationships with city and county officials or other aspects of the Project.

13

**D.    The Lenders' Failure to Approve Transactions that Would Enhance the Value of the Project**

27.    Contrary to the false statements made by Barclays in paragraphs 9, 33-36 of the Motion to Dismiss and paragraphs 53-57 of the Wuest Declaration, the Lenders and, not in any way the Debtor, impeded the ability to close a transaction with the Albuquerque Public Schools ("APS") whereby the Debtor would sell APS an additional 25 acres of land for a new state-of-the art regional sports/athletic complex (the "Stadium Transaction") that would be a significant benefit to the Project as even the Lenders admit.  (See correspondence attached as Exhibit 3 to the Starkman Declaration).  The Debtor tried for over nine months (June 2009 to March 2010) to get the Lenders' consent to the Stadium Transaction, but to no avail.  Having never received the necessary consent from the Lenders, the Debtor was unable to consummate the Stadium Transaction and understands that APS is looking elsewhere for land to build the stadium.

28.    By way of background, on September 2, 2003, the Debtor's predecessor, Westland Development Co., Inc., entered into an option agreement (the "Option Agreement") with APS for the purchase of approximately 75 acres of land that APS would use to build a school.  This land is on the corner of Paseo del Volcan and Ladera Drive.  The Lenders were aware of the Option Agreement at the time they made the Loan.  The Option Agreement provided that the infrastructure obligations of the Debtor and APS would be allocated proportionately between the Debtor and APS.

29.    In 2009, APS approached the Debtor about purchasing an additional 25 acres of land to build a regional stadium and were willing to pay a premium price per acre (approximately 20% more per acre than the price per acre of the 75 acres subject to the Option Agreement).  In addition, APS was willing to provide the following concessions: (i) sharing with the Debtor of infrastructure improvement costs of up to $3 million and (ii) relocating the 75 acres from the

14

corner and frontage on Paseo del Volcan thereby freeing up 2,000 feet of valuable commercial freeway frontage. The Stadium Transaction would greatly benefit the Project as it would stand as an important landmark in the Albuquerque community and would be well used by the state-wide population, thereby attracting more people and publicity to the site.

30.     The Debtor approached the Lenders on June 5, 2009 to inform them of the proposed Stadium Transaction and to request their consent to enter into a new agreement covering the Stadium Transaction and release the 25 acres from the Lenders' mortgage upon receipt of a parcel release price for those additional acres. (See correspondence from Danielle Harrison to Greg Cotton dated June 5, 2009, attached as Exhibit 6 to the Starkman Declaration). After much back and forth and the providing of a significant amount of information to the Lenders, as a condition to consent, the Lenders insisted that the Debtor's equity owner provide a 125% letter of credit to cover the Debtor's portion of the infrastructure costs for the Stadium Transaction, notwithstanding that the Loan had matured in July, 2009. (See correspondence from John Cavanaugh to Rob Starkman dated September 11, 2009, attached as Exhibit 7 to the Starkman Declaration). Even though nowhere provided in the loan documents, the request for a letter of credit was also completely unwarranted considering that the Stadium Transaction did not impose significant new obligations on the Debtor relating to infrastructure costs but simply generally incorporated the same obligations described in the Option Agreement in terms of the sharing of costs that Barclays approved when it entered into the Loan. Despite the Debtor's repeated attempts to secure the Lenders' approval so that the Stadium Transaction could be consummated, the Lenders had yet to approve the transaction by March 2010 - over nine months from the Debtor's initial request –even though the Debtor had submitted more than sufficient information to the Lenders for them to make a decision.

15

31.     Since the Debtor was not able to agree to the Stadium Transaction without the
Lenders' consent and the Debtor was unable to obtain that consent, APS chose another site for
the new stadium.  The Debtor was not "stalling" as posited by Barclays in paragraph 9 of the
Dismissal Motion.  Rather, it was unable to act because of the Lenders' inactions and/or
unreasonable demands.  Consequently, not only did the Debtor miss out on the opportunity to
sell the additional acres to APS at a premium, it will not have the huge benefit of having a
stadium on its property that would be a draw to all New Mexicans nor the opportunity to develop
key commercial frontage originally committed to APS under the Option Agreement, thereby
causing significant detriment to the Project due to the fault of the Lenders.

32.     In an effort to develop alternative uses and sources of income for the Project and
because the Debtor was attempting to attract business in the renewable/alternative energy
industry to the site, the Debtor decided to pursue the development of 257 acres of land for solar
energy (the "Solar Farm") in the Zacate portion of the Project.  The Debtor determined that this
income generating alternative use for the land would benefit the Project as it would improve
alternative uses for the land and demonstrate commitment to renewable/alternative energy uses
to the businesses it was soliciting.  Significantly, the Solar Farm would not impact the zoning or
the residential development plans in any way because it would be located in Zacate.  The Debtor
was required to obtain approval from Bernalillo County of a special-use permit for the Solar
Farm.

33.     Since September 16, 2009, the Debtor requested the Lenders' approval for the
filing of a plat (the "Solar Farm Plat") that was a condition for approval of a special-use permit
for the Solar Farm.  (See correspondence from Robert Starkman to Barclays' representatives,
dated September 16, 2009, attached as Exhibit 11 to the Starkman Declaration).  The Lenders

16

have yet to approve this transaction but the Debtor believes it is in the best interests of the Project to move forward with this Solar Farm Plat should the Lenders ever provide consent. This is another example of the Lenders' efforts to interfere with the Debtor's attempts to enhance and develop the Project essentially blocking what income could be derived from the solar energy development.

**E.     The Loan and Intercreditor Agreement**

34.     On or about December 7, 2006 , Barclays loaned the Debtor's predecessor-in-interest, Westland, the sum of $212,320,000.00 (the "Loan") pursuant to a loan agreement, as amended (the "Loan Agreement"). Westland pledged the Real Property and miscellaneous other personal property to Barclays as security for the Loan. On that same date, Westland assigned the Real Property and all of its obligations with respect to the Loan to the Debtor. The original intent of a loan transaction between Barclays and the Debtor was for an acquisition and development loan for the Real Property, with a maturity date of three years plus two, one-year extensions. Ultimately, the loan was reduced in amount and maturity and transformed into a bridge loan. It was never anticipated or expected by the Debtor or Barclays that the Project would generate income in the short term that was sufficient to pay down the Loan or that the Loan would be refinanced as incorrectly stated in paragraph 33 of the Wuest Declaration. It was the Debtor's expectations that the short term bridge loan would be converted to a more long term loan with development financing.

35.     The Intercreditor Agreement between and among each of the Lenders governs the priority of Promissory Note A-1, Promissory Note A-2 and Promissory Note B (collectively, the "Promissory Notes") and their respective rights. (See Intercreditor Agreement and amendments attached as Exhibit 3 to the Cooke Declaration). Under the Intercreditor Agreement, the

priorities of the Notes were established as follows: Note A-1 Holder (Barclays, original principal amount of $85,320,000.00) is in the senior position, Note A-2 Holder (Five Mile, original principal amount of $50,000,000.00) has second priority and Note B Holder (iStar, original principal amount of $77,000,000.00) has third priority. The Intercreditor Agreement contains an elaborate appraisal process to determine which Lender has the right to review and approve proposals by Barclays, as agent, to negotiate or pursue litigation.

**F.     The Debtor's Prepetition Negotiations with the Lenders and the State Court Litigation with the Lenders**

36.     The extended maturity date of the Loan was July 16, 2009 (the "Maturity Date"). Since the extended Maturity Date and up through the Petition Date, the Debtor and Barclays, as agent on behalf of the Lenders, have engaged in extensive discussions concerning potential restructuring options. Those discussions, however, have been complicated by efforts of the Lenders to determine who is the controlling holder through the elaborate appraisal process mandated by the Intercreditor Agreement. Given the Lenders' unreasonable positions during the negotiations, a restructuring deal was not reached. While negotiating with the Lenders, the Debtor also was evaluating and considering all restructuring alternatives in the event an out-of-court restructuring was not accomplished.

37.     Recognizing no erosion of or risk to its collateral, Barclays waited approximately five months after the Maturity Date (December 15, 2009) to commence an action against the Debtor (the "State Court Litigation") by filing a Complaint for Foreclosure and Money Due and for Declaratory Relief, Application for Supplemental Relief, and Verified Application for Writ of Replevin and Appointment of Receiver (the "Foreclosure Complaint") in the State of New Mexico, County of Bernalillo, Second Judicial District Court (the "State Court"). The Foreclosure Complaint contained claims for: (1) foreclosure and money due, (2) declaratory

18

relief and application for supplemental relief to enforce assignment of rents; (3) foreclosure of security interests and application for writ of replevin and (4) appointment of a receiver and request for injunctive relief.

38.     On January 28, 2010, the Debtor filed an Answer to the Complaint for Foreclosure and Money Due and for Declaratory Relief, Application for Supplemental Relief, and Verified Application for Writ of Replevin and Appointment of Receiver (the "Answer"). The Debtor requested that the State Court deny all four claims in the Foreclosure Complaint, and dismiss the Foreclosure Complaint, with prejudice.

39.     Although Barclays sought the appointment of a receiver in its Foreclosure Complaint, it was only approximately two months later, on February 19, 2010, that Barclays filed a Motion for Appointment of a Receiver and for Injunctive Relief (the "Receivership Motion") and a Motion for Partial Summary Judgment (the "Partial Summary Judgment Motion").  Pursuant to the Receivership Motion, Barclays requested that Douglas Wilson, CEO of the Douglas Wilson Companies, be appointed as the receiver for the Property.  The Partial Summary Judgment Motion sought summary judgment on the first three claims of the Foreclosure Complaint.

40.     On March 9, 2010, the Debtor filed a Memorandum in Response to the Plaintiff's Motion for Partial Summary Judgment (the "Summary Judgment Response") and a Response to the Motion for Appointment of a Receiver (the "Receivership Response").  In the Summary Judgment Response, the Debtor argued that Barclays was not entitled to summary judgment on the first three claims of the Foreclosure Complaint because (1) genuine factual issues remained on the first claim, (2) with respect to the second claim, Barclays failed to specify the "supplementary" relief it sought and the application was duplicative of the Receivership Motion,

19

and (3) with respect to the third claim, among other things, the affidavit submitted in support of the issuance of the writ of replevin failed to comply with New Mexico state law requirements.

41.     On March 29, 2010, Barclays filed replies to the Summary Judgment Response and the Receivership Response. The Summary Judgment Motion and Receivership Motion were scheduled to be heard on April 5, 2010 (the "State Court Hearing") but that hearing was stayed because of the filing of the Chapter 11 Case.

## G.     The Chapter 11 Filing and the Debtor's Objectives

42.     Long before the filing, the Debtor and its advisors devoted substantial time to examining the business, determining funding requirements, exploring restructuring alternatives and negotiating with the Lenders of an out-of-court restructuring. In fact, the Debtor was authorized to file for Chapter 11 relief on December 23, 2009, as reflected in the board resolutions filed with the Chapter 11 petition and not on the eve of the hearings on the Receivership Motion and the Summary Judgment Motion. Term sheets for an out-of-court restructuring were exchanged between the Debtor and Lenders from July 9, 2009 through four days before the Petition Date as even Barclays admits. (See Deposition Transcript of Mark Wuest at 65:23-66:16). In addition, even after the commencement of the Chapter 11 Case, the Debtor and the Lenders have been involved in negotiations regarding a consensual restructuring. (See Deposition Transcript of Mark Wuest at 66:16-19). Facing the prospects of the appointment of a receiver, which would be extremely damaging to the Project as set forth below, the Debtor, in consultation with its advisors, determined that filing for Chapter 11 protection was the best and only option to preserve its business as a going concern and maximize value for all creditors. The appointment of a receiver undoubtedly would have jeopardized the value of the Project, as it would have displaced management, adversely impacted the numerous key

20

relationships the Debtor established over the years with state and local agencies and would have anointed a "steward" who had no institutional knowledge to address the day-to-day and long term needs of the Project, given its size, scope and complexity. The Debtor's Chapter 11 filing was designed to maximize the value of the estate and to preserve value that otherwise would be jeopardized if a receiver was appointed.

43.     As indicated at the Initial Status Conference, the Debtor intends to file a Chapter 11 Plan within ninety (90) days of the Petition Date that will implement a restructuring of its indebtedness in accordance with the Bankruptcy Code and preserve going concern value for the benefit of all the Debtor's stakeholders. The Plan will provide for a new value contribution by the current equity holders of the Debtor to retain their equity in the Reorganized Debtor in compliance with the requirements laid out in the Supreme Court's LaSalle decision and pay creditors what they are entitled to receive under the Bankruptcy Code. This will permit the Debtor in all likelihood to pay creditors more than they would receive in a liquidation and preserve the value of the Project.

## ARGUMENT

**A.      Barclays Has Failed to Meet its Burden of Proving Cause for Dismissal**

44.     Section 1112(b)(1) of the Bankruptcy Code provides that "on request of a party in interest, and after notice and a hearing ... the court shall ... dismiss a case under [chapter 11] ... if the movant establishes cause." 11 U.S.C. § 1112(b)(1) (emphasis added to show amendment by the Bankruptcy Abuse Prevention Act and Consumer Protection of 2005 ("BAPCPA")). As amended by BAPCPA in 2005, the Bankruptcy Code mandates that the movant establish cause

for dismissal. Subsection (b)(4) sets forth non-exhaustive examples of "cause".[5] 11 U.S.C. §

1112(b)(4)(A)-(P). Moreover, section 1112(b)(2) of the Bankruptcy Code provides that the

dismissal, if any "provided in paragraph (1) shall not be granted … if the debtor or another party

in interest objects and establishes that – (A) there is a reasonable likelihood that a plan will be

confirmed within the timeframes established in sections 1121(e) and 1129(e) of this title, … ;

and (B) the grounds for [dismissing the case] include an act or omission of the debtor other than

under paragraph 4(A) – (i) for which there exists a reasonable justification for the act or

omission; and (ii) that will be cured within a reasonable period of time fixed by the court." 11

U.S.C. § 1112(b)(2).

45.     The United States Court of Appeals for the Third Circuit (the "<u>Third Circuit</u>") has

held that implicit in section 1112(b)(1) of the Bankruptcy Code is a requirement that a chapter 11

petition be filed in good faith. <u>See</u> <u>In re Integrated Telecom Express, Inc.</u>, 384 F.3d 108, 118 (3d

Cir. 2004) (dismissing chapter 11 case where debtor was financially healthy at time of filing, had

no intention of reorganizing or liquidating as a going concern, and admitted filing was solely to

---

[5]  Notably, the Dismissal Motion fails to mention any specific factors listed in section 1112(b), which includes: (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; (B) gross mismanagement of the estate; (C) failure to maintain appropriate insurance that poses a risk to the estate or to the public; (D) unauthorized use of cash collateral substantially harmful to 1 or more creditors; (E) failure to comply with an order of the court; (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter; (G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor; (H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any); (I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief; (J) failure to file a disclosure statement, or to file or confirm a plan within the time fixed by this title or by order of the court; (K) failure to pay any fees or charges required under chapter 123 of title 28; (L) revocation of an order of confirmation under section 1144; (M) inability to effectuate substantial consummation of a confirmed plan; (N) material default by the debtor with respect to a confirmed plan; (O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and (P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition. 11 U.S.C. § 1112(b)(4)(A)-(P).

take advantage of Bankruptcy Code's provision capping landlord's rejection claim); In re SGL Carbon Corp., 200 F. 3d 154, 160 (3d. Cir. 1999) (dismissing chapter 11 case where debtor was financially healthy at time of filing and admitted that sole purpose of filing was to obtain a tactical advantage in litigation). Thus, filing a chapter 11 petition in bad faith constitutes cause for dismissal under section 1112 of the Bankruptcy Code. See In re Integrated Telecom Express, Inc., 384 F. 3d at 118; In re SGL Carbon Corp., 200 F. 3d 154, 160-62.

46. A movant seeking dismissal under section 1112 of the Bankruptcy Code has the burden to make a prima facie showing of bad faith. See Capital Food Corp. of Fields Corner, 490 F.3d 21, 24 (1st Cir. 2007). The burden then shifts to the debtor to show that the petition was filed in good faith. See In re South Canaan Cellular Investments, Inc., 2009 WL 2922959, *6 (Bankr. E.D. Pa., May 19, 2009); In re Walden Ridge Development, LLC, 292 B.R. 58, 62 (Bankr. D. N.J. 2003).

47. The Third Circuit has determined that "[w]hether the good faith requirement has been satisfied is a 'fact intensive inquiry' in which the court must examine the 'totality of facts and circumstances' and determine where a 'petition falls along the spectrum ranging from the clearly acceptable to the patently abusive.'" Integrated Telecom, 382 F.3d at 118 (quoting SGL Carbon Corp., 200 F.3d at 162)). The Third Circuit has provided instruction in applying the totality of circumstances test to determine good faith: "Our cases have accordingly focused on two inquiries that are particularly relevant to the question of good faith: (1) whether the petition serves a valid bankruptcy purpose, e.g., by preserving a going concern or maximizing the value of the debtor's estate, and (2) whether the petition is filed merely to obtain a tactical litigation advantage." Id. at 119-120. This determination is a fact intensive inquiry, but in general, courts have consistently dismissed chapter 11 petitions when filed by financially healthy companies

23

with no need to reorganize under the protection of chapter 11. See In re SGL Carbon Corp., 200 F.3d at 166.

48.     In determining whether a chapter 11 petition has been filed in good faith, courts generally review the evidentiary record for the following factors: (1) few or no unsecured creditors; (2) a previous bankruptcy petition by the debtor or a related entity; (3) the prepetition conduct of the debtor has been improper; (4) the petition effectively allows the debtor to evade court orders; (5) there are few debts to non-moving creditors; (6) the petition was filed on the eve of foreclosure; (7) a single-asset case; (8) the debtor has no ongoing business or employees; (9) no cash or income; (10) there is no possibility of reorganization; (11) the debtor's income is not sufficient to operate; (12) no pressure from non-moving creditors; (13) reorganization essentially involves the resolution of a two-party dispute; (14) a corporate debtor was formed and received title to its major assets immediately before the petition; (15) the debtor filed solely to create the automatic stay; and (16) the subjective intent of the debtor. See e.g., In re Primestone Inv. Partners, 272 B.R. 554, 557 (D. Del. 2002) (district court affirms dismissal of bankruptcy case after applying totality of circumstances test from the evidentiary record); In re South Canaan Cellular Invs., Inc., Case No. 09-10473, 2009 WL 2922959, *7 (Bankr. E.D. Pa., May 19, 2009) (court denies motion to dismiss after applying totality of circumstances test from the evidentiary record). The existence of one or more such indicia does not compel a finding that the debtor filed its bankruptcy petition in bad faith. South Canann Cellular Investements, 2009 WL 2922959, *7. Instead, a court must consider all the relevant circumstances surrounding the filing, giving due regard to the congressional purposes behind chapter 11. Id.

49.     Here, Barclays has not met its prima facie burden of showing bad faith. Despite its lengthy recitation of "facts" that contain many references to statements "upon information and

24

belief" and submission of thousands of pages in exhibits, Barclays sets forth no actual evidence of the Debtor's bad faith in filing the Chapter 11 Case. The scant, three page argument contained in the Dismissal Motion does nothing more than simply assert, without any evidentiary support, that the case was filed in bad faith. See Dismissal Motion ¶¶ 37-48. Therefore, the Dismissal Motion should be denied.

50. Barclays places great weight on the fact that the filing occurred forty-five minutes before the State Court Hearing and argues that, ipso facto, the Chapter 11 Case was "filed in bad faith for the primary purpose of frustrating Barclays' enforcement of its state law liens." See Dismissal Motion ¶ 37. Barclays fails to mention that numerous term sheets were exchanged between the Debtor and the Lenders from July 9, 2009 through four days before the Petition Date. In addition, the Debtor and the Lenders were engaged in restructuring negotiations on the morning of the Chapter 11 filing. The reasons for the Debtor's filing have been well documented in the First Day Declaration and at the Initial Status Hearing as being to preserve the value of its business as a going concern and assets for the benefit of all stakeholders. Accordingly, the Chapter 11 filing was not instituted as a litigation tactic but rather with the honest purpose of restructuring debt. In fact, the Debtor was authorized to file for Chapter 11 relief on December 23, 2009, as reflected in the board resolutions filed with the Chapter 11 petition. The Debtor chose not to file for Chapter 11 relief sooner because the Debtor believed in good faith that a deal could be accomplished with the Lenders to implement an out-of-court restructuring.

51. Courts, including those in this district, have recognized that the mere filing of a petition during litigation, even on the eve of foreclosure or other methods of debt collection, does not constitute per se bad faith. See, e.g., In re Primestone Inv. Partners, 272 B.R. at 558; In the

25

Matter of Newark Airport/Hotel Ltd., 156 B.R. 444, 449 (Bankr. D.N.J. 1993), aff'd,155 B.R. 93

(D.N.J. 1993); In re EnCap Golf Holdings, LLC et al., Case No. 08-18581, WL 4200324, *7

(Bankr. D.N.J. 2008); Lehman-Gibson Assocs., Inc. v. Baltimore Joint Venture XVI, 64 B.R.

479 (D.D.C. 1986); In re Kasdorf, 64 B.R. 294, 295 (Bankr. D. Colo. 1986); In re North

Redington Beach Assocs., Ltd., 91 B.R. 166, 169 (Bankr. M.D. Fla. 1988); In re Route 202

Corp., 37 B.R. 367, 372 (Bankr. E.D. Pa. 1984).

52.     Barclays points to certain statements made in the First Day Declaration as

indicative of the Debtor's bad faith.  See Dismissal Motion ¶¶ 40-44.  In particular, Barclays

takes issue with paragraphs 20 and 21 of the First Day Declaration.  Paragraph 20 of the First

Day Declaration states:

> In order to avoid the expense, distraction and uncertainty of
> litigation and, more importantly, to efficiently and effectively
> restructure the outstanding indebtedness and maximize value for
> all stakeholders, the Debtor filed a Chapter 11 petition.

53.     Paragraph 21 of the First Day Declaration states:

> Before the bankruptcy filing, the Debtor thoroughly analyzed all of
> its available options and determined that filing for Chapter 11 was
> necessary to preserve the value its business as a going concern and
> assets for the benefit of all stakeholders and to explore all possible
> alternatives for restructuring the Loan in a challenging real estate
> market.

54.     The Debtor respectfully submits that there is no reasonable interpretation of

paragraphs 20 and 21 of the First Day Declaration that could lead to the conclusion that the

Chapter 11 Case was filed in bad faith.  To the contrary, these paragraphs underscore the

Debtor's good faith rationale in seeking Chapter 11 protection–to obtain a breathing spell,

restructure its outstanding indebtedness and preserve the value of its business as a going concern

and assets for the benefit of all stakeholders.

45895/0001-6442292v5

55.     Barclays alleges that the "real reason" that the Debtor filed this case is to "obtain an unwarranted tactical litigation advantage". See Dismissal Motion ¶ 47. Barclays relies on In re 15375 Memorial Corp., 400 B.R. 420 (D. Del. 2009) to support this contention. In Memorial Corp., the District Court found that (1) the record demonstrated that there was no legitimate bankruptcy purpose because the petitions did not capture any value for the estates that otherwise would have been lost since the debtors did not have any meaningful assets and (2) the record demonstrated that the Debtor's primary objective was to gain a tactical advantage in litigation. Id. at 277 (emphasis supplied). Here, the evidentiary record does not support either of the conclusions the District Court reached in Memorial Corp. and, therefore, Barclays reliance on that case is solely misplaced. Rather, the record reflects that the objectives of the filing were not to obtain any litigation advantage over the Lenders but, instead, to (i) preserve the value of the business as a going concern and assets for the benefit of all stakeholders which would be jeopardized by the appointment of a receiver and (ii) restructure its outstanding debt pursuant to a plan of reorganization. Thus, the Debtor filed to avail itself of the rehabilitative provisions of the Bankruptcy Code and maximize the value of the estate for the benefit of all creditors.

56.     Barclays asserts that this Chapter 11 Case is a "classic two-party dispute between the Debtor and its secured lender, which holds a lien on all of the Debtor's material assets." See Dismissal Motion ¶ 47. Curiously, Barclays fails to mention that the Debtor has two other secured lenders – Five Mile and iStar – with significant and distinct claims against the estate based upon the outstanding Loan and their respective notes. Although Barclays, as agent, can act on behalf of the Lenders, the Debtor's debt on account of the Loan and the State Court Litigation involves all of the Lenders. Furthermore, the Debtor's Schedules reflect approximately $845,000 of non-insider unsecured debt owed to approximately 43 creditors. In addition, the

27

Schedules reflect additional debt owed to two creditors that have filed liens against the Debtor with unknown secured claims. Thus, it cannot be credibly argued that this case involves simply a two-party dispute. Courts have held that bankruptcy cases that essentially are two-party disputes are not conclusive of bad faith. See Walden Ridge, 292 B.R. at 62; see also In re Stolrow's, Inc., 84 B.R. 167, 171 (9th Cir. BAP 1988); In re Hulse, 66 B.R. 681, 683 (Bankr. M.D. Fla. 1986).

57.     Accordingly, any argument that the Chapter 11 Case should be dismissed simply because of the timing of the filing or some misguided argument that this is a two-party dispute completely misses the mark and cannot in any way serve as a basis for this Court to consider that the Debtor's commencement of this Chapter 11 Case was in bad faith. As shown below, the Debtor filed in good faith for legitimate bankruptcy purposes and should be afforded the opportunity to reorganize. Therefore, the Dismissal Motion must be denied.

**C.     The Petition was Filed in Good Faith**

58.     Even if the Court determines that Barclays has met its initial burden to show bad faith (which it has not), and the burden shifts to the Debtor to demonstrate good faith, the Debtor has more than met that burden. In the event the Court looks to section 1112(b)(2) of the Bankruptcy Code in its analysis, the Debtor submits that it has shown that it intends to file a plan of reorganization within ninety days of the filing in compliance with section 1129(e) of the Bankruptcy Code.

59.     The Third Circuit has held that where financially troubled petitioners seek a chance to remain in business, the exercise of the bankruptcy powers is justified. SGL Carbon, 200 F.3d at 165-166. Long before the filing, the Debtor and its advisors devoted substantial time to examining the business, determining funding requirements, exploring restructuring

28

alternatives, and negotiating with the Lenders an out-of-court restructuring deal. Facing the prospects of the appointment of a receiver, which would be extremely damaging to the Project as set forth below, the Debtor, in consultation with its advisors, determined that filing for Chapter 11 protection was the best and only option to preserve its business as a going concern and maximize value for all creditors. The appointment of a receiver undoubtedly would have jeopardized the value of the Project, as it would have displaced management, adversely impacted the numerous key relationships the Debtor established over the years with state and local agencies and would have anointed a "steward" who had no institutional knowledge to address the day-to-day and long term needs of the Project, given its size, scope and complexity. The Debtor's Chapter 11 filing was designed to maximize the value of the estate and to preserve value that otherwise would be jeopardized if a receiver was appointed.

60.    An examination of all the relevant factors that courts consider in determining whether a case was filed in good faith weigh in favor of the Debtor. Specifically, the Debtor has substantial secured and unsecured debt owed to approximately fifty (50) creditors; the Debtor has sufficient cash through an equity contribution to fund costs and expenses during the Chapter 11 Case; there were no prior bankruptcy petitions; the Debtor's prepetition conduct was not improper given its financial distress; the Debtor's subjective intent - to maximize value and preserve its business as a going concern - is proper; the Debtor did not file solely to create the automatic stay; the Debtor has an on going business; the Debtor has approximately 35 employees that are provided through a management services agreement; and the Debtor intends to file a plan of reorganization within ninety (90) days of the Petition Date that provides for a new value contribution by the current equity holders and pays creditors what they are entitled to receive under the Bankruptcy Code. While the issue of whether this is a single asset real estate case will

29

not be contested,[6] the United States District Court for the District of Delaware (the "Delaware District Court") noted that "'there is nothing inherently improper in a single asset debtor filing a Chapter 11 Petition for Reorganization, even shortly before or after a foreclosure proceeding has commenced.'" Primestone, 272 B.R at 558.

61.     Barclays' claims that the Debtor's alleged pursuit of "some visionary development scheme that has utterly failed under the Debtor's mismanagement for the past three years" does not support a finding of a good faith finding and Barclays looks to Little Creek Development, a Fifth Circuit case, for support. See Dismissal Motion ¶¶ 30-36, 46 (citing Little Creek Dev. Co. v. Commonwealth Mortgage Corp. (In re Little Creek Dev. Co.), 779 F. 2d 1068, 1073 (5th Cir. 1986)).  These allegations of prepetition mismanagement are totally unfounded. As set forth in paragraphs 5-9 of the Starkman Declaration, there has been no mismanagement by the Debtor over the past three years but, instead, the Debtor has made significant infrastructure improvements at the Real Property.  In addition, the Debtor has spent considerable time and incurred costs in planning for the development of the Project.  It was never contemplated that the Project would generate income in the short term.  The Debtor has taken steps to improve the Project and enhance its value through the Stadium Transaction and the Solar Farm Plat, only to be effectively blocked from effectuating those transactions by the Lenders who failed to provide their necessary consent.

---

[6] In the Lift Stay Motion, Barclays requests that the Court determine that this is a single asset real estate case. See Lift Stay Motion at ¶¶ 70-75.  As explained in the Debtor's Objection to Lift Stay Motion filed contemporaneously herewith, the Debtor will not contest that determination, although the issue is legitimately debatable, so as to avoid wasting the Court's time as the Debtor intends to file a plan of reorganization within 90 days of the filing.  See Objection to Lift Stay at ¶ 1.

45895/0001-6442292v5

62.     Furthermore, <u>Little Creek Development</u> does not support Barclays' arguments but in fact, supports the Debtor's lack of bad faith.  In <u>Little Creek Development</u>, the United States Court of Appeals for the Fifth Circuit (the "<u>Fifth Circuit</u>") <u>reversed</u> the order of the bankruptcy court which had lifted the automatic stay upon a finding of a lack of good faith so that a secured creditor could foreclose on the debtor's single asset.  The bankruptcy court considered statements made by counsel for the debtor at a hearing as evidence of bad faith since the debtor "simply wanted to transfer the litigation from state court to bankruptcy court where it could have an automatic injunction and escape the state court's bond requirement."  <u>Little Creek Development</u>, 779 F. 2d at 1071.  The Fifth Circuit found that the statements made by debtor's counsel did not provide sufficient evidence to warrant lifting the stay due to the debtor's bad faith.  <u>Little Creek Development</u>, 779 F. 2d at 1073.  Significantly, the Fifth Circuit held that the filing of a petition on the eve of foreclosure, as was done by the debtor, is not bad faith if the debtor can reorganize.  <u>Id.</u> (citing <u>In re Route 202 Corp.</u>, 37 B.R. 367, 373 (Bankr. E.D. Pa 1984)).  The Fifth Circuit, in reversing the bankruptcy court stated that "these facts do not rise to the level of egregiousness necessary to conclude that the reorganization process is being perverted in this case."  <u>Id.</u> at 1073.  However, the Fifth Third noted that under circumstances where the Debtor has no employees, a single asset subject to liens and no sources of income to support a plan, resort to bankruptcy is not proper.  <u>Id.</u>  Here, the record does not demonstrate any bad faith on the part of the Debtor as there is a going concern to preserve and a possibility of a successful reorganization with a source of income to support a plan of reorganization through an equity contribution.

63.     Although not cited by Barclays, the Debtor believes it is important to discuss <u>Primestone</u>, a single asset real estate case in which the Delaware District Court affirmed the dismissal of a petition due to the debtor's bad faith under the totality of the facts and

31

circumstances test. The <u>Primestone</u> debtor had only one secured creditor, four unsecured non-insider creditors, one asset and no income or cash. <u>Primestone</u>, 272 B.R at 557. The present facts are distinguishable from <u>Primestone</u>. Here, as set forth in the Schedules, the Debtor has three secured lenders, two potential secured lien holders, approximately forty-five (45) unsecured creditors – two of which are insiders - and approximately $3.9 million in cash. In addition, there are numerous other factors set forth in paragraph 61 above that support a finding of good faith.

64.     The Debtor submits that the present facts substantially mirror those in <u>In re Crown Village, LLC</u>, 415 B.R. 86 (Bankr. D. Del. June 12, 2009). In <u>Crown Village</u>, the bankruptcy court denied a motion to dismiss a single asset real estate case after finding that eight of the evidentiary factors enunciated in the <u>Primestone</u> decision were satisfied: (i) the petition was not filed on the eve of foreclosure, (ii) there was no two party dispute, (iii) the debtor faced pressure from non-moving creditors, (iv) there were no prior bankruptcy petitions, (v) the debtor's prepetition conduct was not improper given its financial distress, (vi) the debtor was not formed immediately prepetition, (vii) the debtor did not file solely to create the automatic stay and (viii) the debtor's subjective intent to maximize value was proper. Here, all but one of the <u>Crown Village</u> factors are present (<u>i.e.</u>, the Debtor was not facing pressure from non-moving creditors prior to the filing), although the Debtor recognizes that the Petition was filed prior to a foreclosure hearing (and not an actual foreclosure). Moreover, in denying the motion to dismiss, the Court emphasized that the debtor was faced with two choices: (i) to abandon its sole asset or (ii) seek to maximize the value of its asset through the bankruptcy process. <u>Crown Village</u>, 415 B.R. at 93. Here, the Debtor was faced with the exact same choices, and like the debtor in <u>Crown Village</u>, opted for the latter. There are no "bad faith" inferences to be made from this

32

decision, certainly none can be shown by Barclays to satisfy its burden of proof under section 1112(b)(1) of the Bankruptcy Code. Therefore, the Court should afford the Debtor with its statutory right to reorganize and deny the Dismissal Motion.

## **CONCLUSION**

65.     For the reasons set forth above, the Debtor respectfully requests that the Court deny the Dismissal Motion, with prejudice.

Dated: April 28, 2010
        Wilmington, Delaware

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.

By:     */s/ Marion Quirk*
        Norman L. Pernick (No. 2290)
        Marion M. Quirk (No.4136)
        Sanjay Bhatnagar (No. 4829)
        500 Delaware Avenue, Suite 1410
        Wilmington, DE  19801
        Tel: (302) 652-3131
        Fax: (302) 652-3117

        - and –

        Michael D. Sirota, Esquire
        Warren Usatine, Esquire
        Ilana Volkov, Esquire
        25 Main Street
        Hackensack, NJ 07602-0800
        Tel: (201) 489-3000
        Fax: (201) 489-1536

        Proposed Counsel for the Debtor
        and Debtor in Possession

45895/0001-6442292v5